IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 15, 2002 Session

## STATE OF TENNESSEE v. DARYL LEE MADDEN AND MARTY DALE WILLIAMS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 98-A-627     Cheryl Blackburn, Judge**

---

**No. M2000-02227-CCA-R3-CD - Filed July 19, 2002**

---

A Davidson County Grand Jury returned a three-count indictment alleging the defendants committed felony murder during the perpetration of a robbery, especially aggravated robbery, and premeditated first degree murder. A Davidson County jury convicted the defendants of felony murder, especially aggravated robbery, and second degree murder. The second degree murder was merged into the felony murder by the trial court. Madden received an effective sentence of life plus 25 years; Williams received an effective sentence of life. In this appeal, both defendants contend the evidence was insufficient to sustain their convictions for felony murder and especially aggravated robbery, and their sentences were excessive. Defendant Madden additionally contests his conviction for second degree murder and the trial court's certification of the trial transcript. After a review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JAMES CURWOOD WITT, JR., JJ., joined.

Cynthia M. Fort (on appeal) and F. Michie Gibson, Jr. (at trial), Nashville, Tennessee, for the appellant, Daryl Lee Madden.

John E. Herbison (on appeal) and Sam Wallace, Sr. (at trial), Nashville, Tennessee, for the appellant, Marty Dale Williams.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Roger D. Moore and Sarah Carran Daughtrey, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Metro Police Officer Gary Shoats testified that during the late evening of November 11, 1997, he was "moonlighting" at a convenience store located near "Jerry's Bar." A "small-framed" man with a bloody face entered the store and said "[s]ome guy jumped me and rolled me." Shoats testified the man had been beaten worse than anybody he had ever seen.

Doris Peterson, a first-time patron of Jerry's Bar, testified that on the evening of November 11th, she saw an argument at the bar "between a little guy sitting at the bar and a bigger guy, blond-headed, and the bartender." Peterson stated she heard a portion of the argument which indicated the "little guy" drank too much on the previous night and called the bartender a "bi**h." She testified she saw the blond man slap the smaller man who then said, "just let me drink my beer, I'll leave." Peterson said the victim offered money to be left alone, appeared "completely passive,"and never said "anything bad." She testified that three men forcibly removed him from the bar, dragging him from his bar stool and shoving him outside. She stated there were three men involved in the beating, two dark-haired men and a blonde-haired man wearing cowboy boots, the latter of whom inflicted the most blows. She identified Williams as the blonde-haired man but was unable to identify Madden.

Peterson further stated the bar patrons gathered around the windows and watched the beating. She said, at one point, the men had the victim between two cars kicking him, while the victim was in a fetal position asking not to be kicked anymore. She further said the victim was facing Williams, who kicked the victim with the "point of his cowboy boot," while "the man behind him was probably getting in his lower back." Peterson said the bar's occupants were just watching the fight; the victim was being hit all over his body; she got sick, left the bar, and told the men that "[the victim was ] little [and] he [was] going to die [because] [y]ou all are awfully big." She said Williams then turned to her and inquired if she "want[ed] some." Peterson said she felt intimidated and left.

Michael R. Haynor, a regular at Jerry's Bar, testified he knew Madden as an acquaintance but did not know Williams. He stated that while at Jerry's Bar on November 11th, he saw Madden get into a disagreement with someone, and Madden started to escort the person outside. Haynor further testified he quit watching and could not attest whether they actually went outside. Although Haynor described the victim as being aggressive and intoxicated, he explained, however, the victim was not being physically aggressive.

Ken Kinnard, also a regular at Jerry's Bar, testified he was there on November 11th, heard an argument, and saw Madden escorting a man from the bar. Kinnard further testified he saw nothing occur outside, and Madden was back on stage singing karaoke within two minutes. Kinnard explained he also saw Williams, who was wearing cowboy boots, return from outside walking with a limp.

Jerry's Bar regular Bobby Jenkins testified the victim was involved in a verbal confrontation with an off-duty bartender. He stated the victim never raised his voice; the bartender left; Madden

confronted the victim; Madden ordered the victim to leave; Madden then grabbed the victim by the back of his neck; and Madden forced the victim outside. Jenkins testified he saw Madden hit the victim in the face, and Williams kick the victim "in the gut" with his cowboy boots while the victim was on the ground. Jenkins further stated he never saw the victim strike at the defendants.

Jerry's Bar employee Cindy Hankammer testified both defendants were regulars in the bar. She stated that several nights prior to November 11th, the victim paid her for three beers with a $100 bill, she returned the correct change, and he left. Hankammer stated that on November 11th the victim approached her, grabbed her arm, and called her a thief. She said the victim was belligerent, and Madden inquired what was wrong. She informed Madden of the victim's conduct, went to the restroom, and saw Madden singing karaoke a few minutes later.

Lisa Reeves testified she played in a dart league at Jerry's Bar. Reeves stated that on November 11th, the victim was "ranting" about a $100 bill, and the defendants picked the victim up and carried him outside, splitting the tables and spilling beer. Reeves stated that when she went outside, Williams was holding the victim upside down by the back of his pants, pulling items from his pockets. She stated the victim's face was bloody, and she only looked out "long enough for Daryl [Madden] to tell [her] to . . . not disrespect him and get back in the bar." She testified she told Madden that "disrespect had nothing to do with it," and she requested he let the man go. Reeves stated Williams never spoke, and he continued pulling things from the victim's pockets. Reeves said she went back inside and resumed playing darts.

Reeves stated she later looked out the window and saw the victim being kicked by both defendants while the victim was limp on the ground. Reeves further testified when she went outside for a second time, the victim was trying to flee while the defendants were "still pulling stuff away from him." She stated when Madden saw her, he said, "Get back in. . . . For the second time, do not disrespect me." Reeves testified she again requested they let the victim go.

Reeves further explained Madden reentered, sat at the bar, and smoked a cigarette before rejoining Williams outside. She stated the defendants reentered, and Williams had the victim's pager and a lock of hair. She said Williams put "a big wad of money" on the counter, but she was unaware of what happened to the money. She stated these items came from the victim's pocket.

Metro Homicide Detective E.J. Bernard testified he received a pair of bloody cowboy boots, a comb, and the victim's pager from Madden. Agent Chad D. Johnson testified he completed DNA analysis on the boots and concluded it was the victim's blood.

Dr. Bruce Levy testified he performed the autopsy on the victim and concluded the victim died of blunt-force injuries to his head and torso. Dr. Levy opined the victim's head was struck a minium of four blows and his torso injuries were consistent with being kicked with a boot.

Charles Madden, Sr., Daryl Madden's father, testified he saw Williams wearing his son's cowboy boots on November 11th.

-3-

Debra Whorley, Madden's friend of twenty years, testified she was at Jerry's Bar on November 11th celebrating Madden's birthday. She stated Madden led the victim outside following a confrontation. She further stated upon their arrival outdoors, the victim swung at Madden and pulled something from his pocket. Whorley explained Madden then struck the victim once in self-defense, and Williams kicked the victim. She stated that after Madden attempted to stop Williams from hurting the victim, Madden reentered the bar and left Williams and a "blond-haired guy" with the victim. Whorley stated Williams and the unknown man continued kicking the victim.

Jack Conner, a Jerry's Bar regular, testified that when he arrived at Jerry's Bar at approximately 12:15 a.m., Madden had already gone. He explained that he gave Williams a ride home. Conner testified Williams said he kicked the victim; Williams had a switch-blade hair brush and a pager he had taken from the victim; and Williams wore boots with silver toe tips. Conner stated they entered Williams' residence; Madden called; he drove Williams to Madden's residence; and Williams placed the pager and brush on Madden's coffee table.

Defendant Madden testified Williams came by his house early that evening, showered, and borrowed a pair of boots. Madden stated they left his residence and went to Jerry's Bar. He stated that after he sang a couple of songs, the bartender told him "[t]hat jerk claims I ripped him off," and he saw the victim "slinging his arms around." Madden said that since he was the person who handled problems at Jerry's, he requested that the victim leave. Madden stated he placed his hand on the victim's shoulder and "escorted" him to the door. He said the victim was drunk and "mouthing" while being escorted outside.

Madden further testified that after he took the victim outside, Madden inquired what the problem was, and the victim slapped at him. Madden explained the victim then reached for his back pocket; he punched the victim between two and four times in the face; while the victim fell, he held the victim's collar to ease him down to the concrete; he heard an object sliding, which "turned out to be a brush;" and Williams kicked the victim in the face causing the victim to go backwards down the steps.

Madden stated Williams and another man then struck the victim, and when he was able to get back to the victim, the victim was laying on the concrete bleeding. Madden testified he reentered the bar, had a cigarette and a drink, and instructed someone to call for an ambulance. Madden stated Williams reentered the bar with an object in his hand, and Madden went back outside and saw the victim who appeared badly beaten. Madden said the victim refused his offer to carry him to the hospital.

Madden stated he went home, received a phone call, returned to the bar, told Detective E.J. Bernard what happened, and returned home. Madden stated he called Detective Bernard the following day to inform him that Williams left the victim's brush, pager, and pocket change at his house, and Madden took the items to the police station. Madden explained he called Williams pursuant to the detective's request, picked up the boots, and took them to the police station the following day.

On cross-examination, Madden denied telling Reeves to stop disrespecting him and claimed he pushed Williams and another person away from the victim after seeing Williams kick the victim twice. Madden explained Williams took change out of the victim's pocket and kept it.

Sandra Hensley, Williams' mother, testified she picked up Williams at Madden's home on November 12th. Hensley further testified that after they returned home, Williams went in his bedroom, retrieved a pair of boots, placed them in the kitchen sink, and turned on the water. Hensley said she instructed him to stop; Williams complied and left the boots in the living room; and Madden subsequently picked up the boots.

Defendant Williams testified he had known Madden for approximately ten years. Williams stated that he, Madden, and Debra Worley arrived at Jerry's Bar at approximately 8:30 p.m. Williams said bartender Hankammer began arguing with the victim; Madden grabbed the victim by the neck and escorted him outside; and Madden struck the victim approximately five times. Williams said the victim then reached for his back pocket, and Williams kicked the victim in the upper leg or kidney area. He further testified Madden grabbed the victim by the hair causing the victim to impact the ground face-first; Madden hit the victim approximately four times on the head; Madden pushed the victim down a set of steps; and Madden took "something from the man's pocket," gave it to Williams, and told him to give it to Hankammer.

Williams stated he reentered the bar, leaving Madden alone with the victim, and handed Hankammer the victim's money. Williams explained that when he exited, Madden was kicking the victim. Williams testified he and Madden reentered the bar, leaving the victim sitting on the ground. Williams stated Madden twice told Reeves to not disrespect "him."

Williams said he and Madden left the bar so Madden could change his boots and clothing; Madden gave him the boots and requested he clean them; Williams returned to the bar; and Connor subsequently drove him to Madden's residence. Williams testified he later went home and upon learning the victim died, decided to clean the boots and destroy evidence pursuant to Madden's request; however, his mother would not allow it.

On cross-examination, Williams denied hurting his leg when kicking the victim or walking with a limp, but he conceded he wore boots on the evening of the incident which were "almost identical" to the boots admitted into evidence.

The jury convicted both defendants of felony murder, especially aggravated robbery and second degree murder. The second degree murder conviction was merged by the trial court into the felony murder conviction.

## CONVICTIONS UNDER COUNT THREE

Although not raised by the parties, we first address the conviction under Count 3 of the indictment. Count 3 charged the offense of premeditated first degree murder. The defendants and the state relate, without dispute, that the defendants were convicted by the jury of the lesser-included offense of second degree murder. However, our reading of the record reveals numerous contradictions. The transcript of the announcement of the jury verdict by the foreperson reflects that the jury found both defendants "guilty of premeditated first degree murder" in Count 3. However, the minute entry on that date indicates the verdict was guilty of "second degree murder." Other documents filed after the verdict, including the judgments of conviction, reflect the verdicts and convictions were for second degree murder. Similarly, the trial court's statements at the sentencing hearing, as well as its Tennessee Supreme Court Rule 12 report, indicate second degree murder. However, the trial court's Sentencing Order reflects the jury convicted the defendants of "First Degree Premeditated Murder in Count 3," which was merged into felony murder in Count 1.

The technical record contains no order reducing premeditated first degree murder to second degree murder after the verdict or at the hearing on the motions for new trial. The order denying the motions for new trial makes no mention of this issue. Furthermore, at the hearing on the motions for new trial, the trial court stated the jury convicted the defendants of second degree murder under Count 3.

In light of all the facts and circumstances set forth above, we assume the defendants were convicted of second degree murder which was merged into the felony murder. Thus, we will not address premeditated first degree murder.

## SUFFICIENCY OF THE EVIDENCE

Defendant Madden contends the evidence was insufficient to sustain his convictions for first degree felony murder, second degree murder, and especially aggravated robbery. Defendant Williams contends the evidence was insufficient to sustain his convictions for first degree felony murder and especially aggravated robbery. We respectfully disagree.

## A. Standard of Review

When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence or a combination of direct and circumstantial evidence. State v. Brewer, 932 S.W.2d 1,18 (Tenn. Crim. App. 1996).

In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence.  State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence.  Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956).  To the contrary, this court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.  State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995).

The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence.  Id.  In State v. Grace, the Tennessee Supreme Court stated, "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  493 S.W.2d 474, 476 (Tenn. 1973).

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Grace, 493 S.W.2d at 476.

## B.  First Degree Felony Murder

Our statute defines first degree murder, in part, as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery. . . ."  Tenn. Code Ann. § 39-13-202(a)(2).  The code further states "[n]o culpable mental state is required . . . except the intent to commit the enumerated offenses or acts. . . ."  Id. at (b).  Additionally, the death must occur "in the perpetration of" the enumerated felony.  State v. Hinton, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000) (citations omitted).  The killing may precede, coincide with, or follow the felony and still be in the perpetration of the felony, so long as there is a connection in time, place, and continuity of action.  State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999).

If the underlying felony and killing were part of a continuous transaction with no break in the chain of events and the felon had not reached a place of temporary safety between the events, felony murder is sufficiently established.  State v. Pierce, 23 S.W.3d 289, 294-97 (Tenn. 2000).  Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances.  Buggs, 995 S.W.2d at 107.

Defendants contend the evidence was insufficient to sustain the conviction for felony murder because there was no continuity of action between the robbery/theft and the fatal beating, and the evidence was insufficient to prove robbery/theft because there was no proof of an intent to deprive the victim of his property.

Robbery is an "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. "Deprive" means to "[w]ithhold property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner." Tenn. Code Ann. § 39-11-106(a)(8)(A).

The evidence, viewed in a light most favorable to the state, established Madden forcibly removed the victim from the bar. Madden, along with Williams, then struck the victim numerous times. Williams kicked the victim numerous times with the point of his cowboy boots. Both defendants intimidated bystanders who asked them to stop. The victim never struck at either defendant and was "completely passive." Madden and Williams took items from the victim's pockets. Madden gave Williams money taken from the victim. Some of the victim's property was subsequently recovered from Madden.

The jury was free to conclude the defendants exercised control over the victim's property intending to deprive him of it without having the victim's effective consent. Furthermore, the evidence sufficiently established the continuity of action between the robbery and the conduct resulting in death, since the robbery and killing were part of a continuous transaction with no break in the chain of events. Pierce, 23 S.W.3d at 294-95. The evidence sufficiently established the necessary continuity of action and intent to deprive the victim of his property.

## C. Second Degree Murder

Defendants were convicted of both felony murder and second degree murder. The trial court merged the second degree murder into the felony murder. Madden contends the evidence was insufficient to sustain his conviction for second degree murder. We respectfully disagree.

The Tennessee Code defines second degree murder, in part, as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A "knowing" killing is one in which "the person is aware that the conduct is reasonably certain to cause [death]." *Id.* § 39-11-106(a)(20); *see also* State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000).

Viewing the evidence in a light most favorable to the state, the evidence is sufficient to support the verdict. The defendants brutally and unmercifully beat the victim to death. They were warned by Lisa Reeves twice to stop the beating, and they were also warned by Doris Peterson that the victim was "going to die;" yet, they continued the attack. The defendants continued beating the victim even after he had curled in a fetal position and was limp on the ground. Although the defendants testified they thought the victim had pulled a weapon, it is the jury's prerogative to reject self-defense. *See* State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). Accordingly, a rational trier of fact could conclude beyond a reasonable doubt that Madden knowingly killed the victim.

## D. Especially Aggravated Robbery

Both defendants contend the evidence is insufficient to sustain their convictions for especially aggravated robbery because cowboy boots cannot be a deadly weapon. We respectfully disagree.

Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). "Especially aggravated robbery" is robbery "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a). The term "deadly weapon" is defined as "(A) [a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or (B) [a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tenn. Code Ann. § 39-11-106(a)(5). Accordingly, there are two classes of deadly weapons – those being either deadly *per se*, such as firearms; or deadly by reason of the manner in which they are used. Morgan v. State, 220 Tenn. 247, 415 S.W.2d 879, 882 (1967). Although hard objects wrapped in socks have been found to be "deadly weapons" within the meaning of the statute, unclad fists and feet are not. State v. Flemming, 19 S.W.3d 195, 198 (Tenn. 2000).

Neither the defendants nor the state have cited any Tennessee authority that directly addresses whether boots worn by an offender can constitute a deadly weapon, and our independent research finds no Tennessee authority. Accordingly, we choose to look to the decisions by our sister states for guidance. *See* State v. Newsome, 778 S.W.2d 34, 36 (Tenn. 1989). It appears most jurisdictions hold "an assault with a shod foot may constitute an assault with a deadly weapon depending upon the manner and use of the shoe under the circumstances." Christopher Vaeth, Annotation, *Kicking as Aggravated Assault, or Assault with Dangerous or Deadly Weapon*, 19 A.L.R.5th 823, § 4. (1994).

We believe Tennessee follows this majority view. In holding "fists and feet" were not deadly weapons under Tennessee Code Annotated section 39-11-106(a)(5)(B) (an object in which the manner of its use or intended use is capable of causing death or serious bodily injury), our supreme court stated, "[W]e conclude that the increased penalty for use of a deadly weapon is appropriate when *an object or instrument other than one's own body* is used in the commission of a criminal offense." Flemming, 19 S.W.3d at 198 (emphasis added). However, the court held that a deadly weapon does "[not] encompass body parts." In the instant case, the victim was kicked not with a mere foot, but with objects worn on the feet, namely pointed-toe cowboy boots.

The medical proof established the victim had multiple rib fractures and a lacerated liver, consistent with being kicked with the pointed cowboy boots exhibited at trial. This situation is distinguishable from Flemming and is more akin to State v. Robinson, 971 S.W.2d 30, 48 (Tenn. Crim. App. 1997) (stating a stick or brick held in a defendant's hand can be a deadly weapon for sentencing purposes); *see also* Morgan, 415 S.W.2d at 882 (holding a sock containing a hard object

held in defendant's hand used to club the victim during perpetration of a robbery was a deadly weapon). Accordingly, the jury was free to conclude the robbery was especially aggravated based upon the victim's serious bodily injury and the pointed-toe cowboy boots used as a deadly weapon.

## SENTENCING

Madden received consecutive sentences of life plus 25 years. Although Williams also received a life sentence for felony murder and 25 years for especially aggravated robbery, his sentences ran concurrently. Both defendants contend their sentences are excessive. We respectfully disagree.

### A. Standard of Review

This court's review of the sentence imposed by the trial court is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). This presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999). If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is *de novo*. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997). The burden is upon the appealing party to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments.

If no mitigating or enhancement factors for sentencing are present, Tennessee Code Annotated section 40-35-210(c) provides that the presumptive sentence for the Class A felony especially aggravated robbery shall be the midpoint within the applicable range. The applicable range of punishment is 15 to 25 years, *see* Tenn. Code Ann. § 40-35-112(a)(1); thus, the presumptive sentence is 20 years. However, if such factors do exist, a trial court should enhance the sentence within the range for enhancement factors and then reduce the sentence within the range for the mitigating factors. Tenn. Code Ann. § 40-35-210(e); State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). No particular weight for each factor is prescribed by the statute, as the weight given to each factor is left to the discretion of the trial court as long as the trial court complies with the purposes and principles of the sentencing act and its findings are supported by the record. State v. Moss, 727 S.W.2d 229, 238 (Tenn. 1986); State v. Kelley, 34 S.W.3d 471, 479 (Tenn. Crim. App. 2000); *see* Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments. Nevertheless, should there be no mitigating factors, but enhancement factors are present, a trial court may set the sentence above the presumptive sentence. Tenn. Code Ann. § 40-35-210(d); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

### B. Daryl Madden

Regarding Madden, the trial court applied sentencing enhancement factors one (previous history of criminal convictions or criminal behavior ), two (a leader in the commission of an offense

involving two or more criminal actors), five (treating or allowing a victim to be treated with exceptional cruelty), and eleven (the felony resulted in death or bodily injury of another person and the defendant has previously been convicted of a felony that resulted in death or bodily injury). *See* Tenn. Code Ann. § 40-35-114(1), (2), (5), (11). The trial court found no mitigating factors and sentenced Madden to 25 years. The trial court further concluded Madden had an extensive record of criminal activity and was a dangerous offender; it ran his 25-year sentence consecutively to his life sentence for felony murder.

## C. Marty Dale Williams

Regarding Williams, the trial court applied sentencing enhancement factors one (previous history of criminal convictions or criminal behavior ), two (a leader in the commission of an offense involving two or more criminal actors), five (treating or allowing a victim to be treated with exceptional cruelty), and eight (previous history of unwillingness to comply with the conditions of a sentence involving release in the community). Tenn. Code Ann. § 40-35-114(1), (2), (5), (8). The trial court applied sentencing mitigating factor eight (defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense) regarding Williams' learning disability. *See* Tenn. Code Ann. § 40-35-113(8).

## D. Analysis

Madden contests the length and the consecutive nature of his sentence for especially aggravated robbery. He offered no proof at the sentencing hearing. On appeal, Madden contests the applicability of sentencing factors two (defendant was a leader in the offense) and five (defendant treated or allowed the victim to be treated with exceptional cruelty). *See* Tenn. Code Ann. § 40-35-114(2), (5). Madden also contends the trial court erred in not applying mitigating factor ten (assisted authorities). *See* Tenn. Code Ann. § 40-35-113(10).

Williams contests the length of his sentence for especially aggravated robbery. He offered no proof at the sentencing hearing. On appeal, Williams contests the weight given sentencing enhancement factor one (previous history of criminal convictions or criminal behavior) and the applicability of enhancement factor two (defendant was a leader in the offense). He further contends the trial court failed to consider his learning disabilities as a mitigating factor.

### (1) Leader in Offense

Both defendants contend factor two was inappropriate. We disagree. Trial testimony established Madden initiated physical contact with the victim by forcing him outside. The defendants punched and kicked the victim numerous times. When others exited the bar and warned the defendants to cease their attack, both defendants at different times threatened them and continued the brutal attack. The trial court's application of this factor to both defendants was proper as there was testimony of the existence of another attacker; furthermore, "both of two criminal actors may qualify for enhancement under this factor." State v. Freeman, 943 S.W.2d 25, 30-31 (Tenn. Crim.

-11-

App. 1996); *see* <u>State v. Hicks</u>, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). The statute does not require that the defendant be "the leader," only that the defendant be "a leader." <u>Freeman</u>, 943 S.W.2d at 30. This issue lacks merit.

### (2) Exceptional Cruelty

Madden contends sentencing enhancement factor five was inappropriate because the facts support no finding of exceptional cruelty above and beyond serious bodily injury, an element of especially aggravated robbery. Since "exceptional cruelty" is not an element of especially aggravated robbery, this enhancement factor may be applied when the facts of a case demonstrate a culpability distinct from and appreciably greater than that incident to the crime of especially aggravated robbery. <u>Poole</u>, 945 S.W.2d at 98.

The defendants beat the victim to the ground, and the victim curled himself in a fetal position. The defendants continued their vicious attack upon the victim even when he, defenseless, requested they stop. When others exited the bar and warned them to stop, they continued the brutal attack. Thirteen-year law enforcement veteran Officer Gary Shoats testified the victim was beaten worse than anyone he had ever seen. The victim died as a result of the beating, and the victim's exceptional injuries were corroborated by Dr. Bruce Levy.

It is clear the defendants continued their attack to an extent sufficiently greater than that necessary to inflict "serious bodily injury." We conclude the proof sufficiently supports the trial court's application of this enhancement factor.

### (3) Assisting Authorities

Madden contends the trial court erred in failing to apply mitigating factor ten (assisting authorities in locating another person involved in the crime) based upon his statements to the detective revealing the names of other individuals present at the bar. *See* Tenn. Code Ann. § 40-35-113(10). The trial court noted Madden only cooperated when it became necessary for his own benefit. We see no error in the trial court's refusal to apply this mitigating factor.

### (4) Weight of Enhancement Factor

Williams challenges the weight given enhancement factor one (prior criminal history). *See* Tenn. Code Ann. § 40-35-114(1). The 27-year-old Williams had numerous misdemeanor convictions when he was 19 and 20 years old. The weight given to each factor is left to the discretion of the trial court as long as the trial court complies with the purposes and principles of the sentencing act and its findings are supported by the record. <u>Moss</u>, 727 S.W.2d at 238; <u>Kelley</u>, 34 S.W.3d at 479; *see* Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments. This issue is without merit.

### (5) Learning Disability

Williams contends that although the trial court noted his learning difficulty, it did not find it to be a mitigating factor. The record does not sustain this position. The trial court stated, "I heard the testimony [at trial] about learning difficulties. I will consider that; however, I do not find that that should be given much substantial weight in this case." The weight given to each factor is left to the discretion of the trial court. Moss, 727 S.W.2d at 238. This issue is without merit.

### (6) Consecutive Sentencing

Madden contends the trial court erred in ordering his sentences to be served consecutively. Again, we disagree. The trial court found the defendant had an extensive record of criminal activity and was a dangerous offender. *See* Tenn. Code Ann. § 40-35-115(b)(2), (4). The defendant had two prior felony convictions and three prior misdemeanor convictions. One of the prior felony convictions was for assault with intent to commit robbery. In addition to finding Madden to be a dangerous offender, the trial court found the aggregate sentence reasonably related to the severity of the offenses and was necessary to protect the public from further criminal conduct by the defendant. *See* State v. Wilkerson, 905 S.W.2d 933, 939 (1995). Consecutive sentencing is clearly supported by the record.

## TRANSCRIPT CERTIFICATION

Madden contends the trial court erroneously certified that portion of the trial transcript relating to defendant Madden's proof. We respectfully disagree.

### A. Hearing Testimony

Carol Briggs, an owner of a court reporting agency, testified at the hearing regarding the accuracy of the transcript. Briggs stated her agency contracted for the defendants' trial. She testified that the scheduled reporter became ill on the third day of the trial, so she obtained a substitute reporter. The substitute reporter e-mailed her trial notes to a typist whom Briggs recommended. The substitute reporter's notes were illegible, so she gave the typist the trial audio tapes; the tapes were partially inaudible. Briggs then compared the reporter's notes with the audible portions of the tape and made corrections to the notes where they conflicted with the tapes. Briggs explained neither Madden's testimony nor Madden's father's testimony was audible, so she deciphered the reporter's outline using context clues, rewrote the transcript on her steno machine, translated it through computer programming, and delivered it to the court. She said her method of preparation "gave [her] a regular transcript." Briggs explained she received little cooperation from the substitute reporter.

### B. Trial Court's Findings

At the conclusion of the hearing, the trial court found:

I have now reviewed this transcript that Ms. Briggs prepared twice; once when it was first presented to me, going line-by-line with my notes, and . . . I take extensive notes. There are three different – I have three different legal pads with regard to the testimony in this case. I take down maybe not word for word, but I take – and I, especially when there is a defendant testifying, I take down just about word for word, and I'll have to say this is an incredibly accurate transcript.

. . . [T]his transcript, especially with regard to Mr. Madden's testimony, because I took it so closely, is incredibly accurate. It captures everything he says... I mean, it is just word for word. . . . I do take very detailed notes; therefore, I can compare the transcript to the notes I've taken. It is accurate. It does depict what was said. The phonetic transcript is not my issue. My issue is what I'm going to certify up to the Court of Criminal Appeals, and I have reviewed this carefully, making sure that it is accurate. . . . I'm going to certify the record on to the Court of Criminal Appeals.

## C. Analysis

Tennessee Rule of Appellate Procedure Rule 24(e) dictates:

If any matter properly includable is omitted from the record . . . or is misstated therein, the record may be corrected or modified to conform to the truth. Any differences regarding whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by the trial court regardless of whether the record has been transmitted to the appellate court. *Absent extraordinary circumstances, the determination of the trial court is conclusive.*

(Emphasis added).

Madden asserts the trial court erroneously certified an unreliable transcript, but Madden fails to specify any significant information that was improperly included or excluded. The trial judge announced she took "very detailed notes" of the challenged testimony, compared the transcript to her notes, concluded the transcript was "incredibly accurate," and certified it. Madden has offered no proof of "extraordinary circumstances" that would dispute this finding; thus, the trial court's certification is "conclusive." *See* Tenn. R. App. P. 24(e). This issue is without merit.

## CONCLUSION

Based upon our review of the record, we affirm the judgment of the trial court.

-14-

_____
JOE G. RILEY, JUDGE