IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 25, 2005 Session

## MARTY DALE WILLIAMS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 98-A-627     Cheryl Blackburn, Judge**

_____

**No. M2005-00169-CCA-R3-PC - Filed February 21, 2006**

_____

Following a jury trial, Petitioner, Marty Dale Williams and his co-defendant, Daryl Lee Madden, were convicted of felony murder, especially aggravated robbery, and second degree murder. The trial court merged the second degree murder conviction with the felony murder conviction. Madden received an effective sentence of life plus 25 years; Petitioner received an effective sentence of life. On direct appeal, a panel of this court affirmed the judgments of the trial court. *See State v. Madden*, 99 S.W.3d 127 (Tenn. Crim. App. 2002). Petitioner filed a timely petition for post-conviction relief which the trial court subsequently denied after a hearing. Petitioner now appeals from the trial court's denial of post-conviction relief. In this appeal, Petitioner argues that the trial court erred in finding that Petitioner failed to establish that his trial counsel was per se ineffective and that trial counsel was ineffective under the totality of the circumstances. The judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT W. WEDEMEYER, JJ., joined.

Ernest W. Williams and John D. Schwalb, Franklin, Tennessee, for the appellant, Marty Dale Williams.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; Roger Moore, Assistant District Attorney General; Carran Daughtery, Assistant District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

The opinion of this court in the direct appeal set forth the facts in this case as follows:

Metro Police Officer Gary Shoats testified that during the late evening of November 11, 1997, he was "moonlighting" at a convenience store located near "Jerry's Bar." A "small-framed" man with a bloody face entered the store and said "[s]ome guy jumped me and rolled me." Shoats testified the man had been beaten worse than anybody he had ever seen.

Doris Peterson, a first-time patron of Jerry's Bar, testified that on the evening of November 11th, she saw an argument at the bar "between a little guy sitting at the bar and a bigger guy, blond-headed, and the bartender." Peterson stated she heard a portion of the argument which indicated the "little guy" drank too much on the previous night and called the bartender a "bi* *h." She testified she saw the blond man slap the smaller man who then said, "just let me drink my beer, I'll leave." Peterson said the victim offered money to be left alone, appeared "completely passive," and never said "anything bad." She testified that three men forcibly removed him from the bar, dragging him from his bar stool and shoving him outside. She stated there were three men involved in the beating, two dark-haired men and a blonde-haired man wearing cowboy boots, the latter of whom inflicted the most blows. She identified Williams as the blonde-haired man but was unable to identify Madden.

Peterson further stated the bar patrons gathered around the windows and watched the beating. She said, at one point, the men had the victim between two cars kicking him, while the victim was in a fetal position asking not to be kicked anymore. She further said the victim was facing Williams, who kicked the victim with the "point of his cowboy boot," while "the man behind him was probably getting in his lower back." Peterson said the bar's occupants were just watching the fight; the victim was being hit all over his body; she got sick, left the bar, and told the men that "[the victim was] little [and] he [was] going to die [because] [y]ou all are awfully big." She said Williams then turned to her and inquired if she "want[ed] some." Peterson said she felt intimidated and left.

Michael R. Haynor, a regular at Jerry's Bar, testified he knew Madden as an acquaintance but did not know Williams. He stated that while at Jerry's Bar on November 11th, he saw Madden get into a disagreement with someone, and Madden started to escort the person outside. Haynor further testified he quit watching and could not attest whether they actually went outside. Although Haynor described the victim as being aggressive and intoxicated, he explained, however, the victim was not being physically aggressive.

Ken Kinnard, also a regular at Jerry's Bar, testified he was there on November 11th, heard an argument, and saw Madden escorting a man from the bar. Kinnard further testified he saw nothing occur outside, and Madden was back on stage singing

karaoke within two minutes.  Kinnard explained he also saw Williams, who was wearing cowboy boots, return from outside walking with a limp.

Jerry's Bar regular Bobby Jenkins testified the victim was involved in a verbal confrontation with an off-duty bartender.  He stated the victim never raised his voice; the bartender left; Madden confronted the victim; Madden ordered the victim to leave; Madden then grabbed the victim by the back of his neck; and Madden forced the victim outside.  Jenkins testified he saw Madden hit the victim in the face, and Williams kick the victim "in the gut" with his cowboy boots while the victim was on the ground.  Jenkins further stated he never saw the victim strike at the defendants.

Jerry's Bar employee Cindy Hankammer testified both defendants were regulars in the bar.  She stated that several nights prior to November 11th, the victim paid her for three beers with a $100 bill, she returned the correct change, and he left.  Hankammer stated that on November 11th the victim approached her, grabbed her arm, and called her a thief.  She said the victim was belligerent, and Madden inquired what was wrong.  She informed Madden of the victim's conduct, went to the restroom, and saw Madden singing karaoke a few minutes later.

Lisa Reeves testified she played in a dart league at Jerry's Bar. Reeves stated that on November 11th, the victim was "ranting" about a $100 bill, and the defendants picked the victim up and carried him outside, splitting the tables and spilling beer.  Reeves stated that when she went outside, Williams was holding the victim upside down by the back of his pants, pulling items from his pockets.  She stated the victim's face was bloody, and she only looked out "long enough for Daryl [Madden] to tell [her] to ⋯ not disrespect him and get back in the bar."  She testified she told Madden that "disrespect had nothing to do with it," and she requested he let the man go.  Reeves stated Williams never spoke, and he continued pulling things from the victim's pockets.  Reeves said she went back inside and resumed playing darts.

Reeves stated she later looked out the window and saw the victim being kicked by both defendants while the victim was limp on the ground.  Reeves further testified when she went outside for a second time, the victim was trying to flee while the defendants were "still pulling stuff away from him."  She stated when Madden saw her, he said, "Get back in⋯. For the second time, do not disrespect me."  Reeves testified she again requested they let the victim go. Reeves further explained Madden reentered, sat at the bar, and smoked a cigarette before rejoining Williams outside.  She stated the defendants reentered, and Williams had the victim's pager and a lock of hair.  She said Williams put "a big wad of money" on the counter, but she was unaware of what happened to the money.  She stated these items came from the victim's pocket.  Metro Homicide Detective E.J. Bernard testified he received a pair of bloody cowboy boots, a comb, and the victim's pager from Madden.  Agent Chad

D. Johnson testified he completed DNA analysis on the boots and concluded it was the victim's blood.

Dr. Bruce Levy testified he performed the autopsy on the victim and concluded the victim died of blunt-force injuries to his head and torso. Dr. Levy opined the victim's head was struck a minium of four blows and his torso injuries were consistent with being kicked with a boot. Charles Madden, Sr., Daryl Madden's father, testified he saw Williams wearing his son's cowboy boots on November 11th.

Debra Whorley, Madden's friend of twenty years, testified she was at Jerry's Bar on November 11th celebrating Madden's birthday. She stated Madden led the victim outside following a confrontation. She further stated upon their arrival outdoors, the victim swung at Madden and pulled something from his pocket. Whorley explained Madden then struck the victim once in self-defense, and Williams kicked the victim. She stated that after Madden attempted to stop Williams from hurting the victim, Madden reentered the bar and left Williams and a "blond-haired guy" with the victim. Whorley stated Williams and the unknown man continued kicking the victim.

Jack Conner, a Jerry's Bar regular, testified that when he arrived at Jerry's Bar at approximately 12:15 a.m., Madden had already gone. He explained that he gave Williams a ride home. Conner testified Williams said he kicked the victim; Williams had a switch-blade hair brush and a pager he had taken from the victim; and Williams wore boots with silver toe tips. Conner stated they entered Williams' residence; Madden called; he drove Williams to Madden's residence; and Williams placed the pager and brush on Madden's coffee table.

Defendant Madden testified Williams came by his house early that evening, showered, and borrowed a pair of boots. Madden stated they left his residence and went to Jerry's Bar. He stated that after he sang a couple of songs, the bartender told him "[t]hat jerk claims I ripped him off," and he saw the victim "slinging his arms around." Madden said that since he was the person who handled problems at Jerry's, he requested that the victim leave. Madden stated he placed his hand on the victim's shoulder and "escorted" him to the door. He said the victim was drunk and "mouthing" while being escorted outside.

Madden further testified that after he took the victim outside, Madden inquired what the problem was, and the victim slapped at him. Madden explained the victim then reached for his back pocket; he punched the victim between two and four times in the face; while the victim fell, he held the victim's collar to ease him down to the concrete; he heard an object sliding, which "turned out to be a brush;" and Williams kicked the victim in the face causing the victim to go backwards down the steps.

Madden stated Williams and another man then struck the victim, and when he was able to get back to the victim, the victim was laying on the concrete bleeding. Madden testified he reentered the bar, had a cigarette and a drink, and instructed someone to call for an ambulance. Madden stated Williams reentered the bar with an object in his hand, and Madden went back outside and saw the victim who appeared badly beaten. Madden said the victim refused his offer to carry him to the hospital.

Madden stated he went home, received a phone call, returned to the bar, told Detective E.J. Bernard what happened, and returned home. Madden stated he called Detective Bernard the following day to inform him that Williams left the victim's brush, pager, and pocket change at his house, and Madden took the items to the police station. Madden explained he called Williams pursuant to the detective's request, picked up the boots, and took them to the police station the following day.

On cross-examination, Madden denied telling Reeves to stop disrespecting him and claimed he pushed Williams and another person away from the victim after seeing Williams kick the victim twice. Madden explained Williams took change out of the victim's pocket and kept it.

Sandra Hensley, Williams' mother, testified she picked up Williams at Madden's home on November 12th. Hensley further testified that after they returned home, Williams went in his bedroom, retrieved a pair of boots, placed them in the kitchen sink, and turned on the water. Hensley said she instructed him to stop; Williams complied and left the boots in the living room; and Madden subsequently picked up the boots.

Defendant Williams testified he had known Madden for approximately ten years. Williams stated that he, Madden, and Debra Worley arrived at Jerry's Bar at approximately 8:30 p.m. Williams said bartender Hankammer began arguing with the victim; Madden grabbed the victim by the neck and escorted him outside; and Madden struck the victim approximately five times. Williams said the victim then reached for his back pocket, and Williams kicked the victim in the upper leg or kidney area. He further testified Madden grabbed the victim by the hair causing the victim to impact the ground face-first; Madden hit the victim approximately four times on the head; Madden pushed the victim down a set of steps; and Madden took "something from the man's pocket," gave it to Williams, and told him to give it to Hankammer.

Williams stated he reentered the bar, leaving Madden alone with the victim, and handed Hankammer the victim's money. Williams explained that when he exited, Madden was kicking the victim. Williams testified he and Madden reentered the bar, leaving the victim sitting on the ground. Williams stated Madden twice told Reeves to not disrespect "him." Williams said he and Madden left the bar so

Madden could change his boots and clothing; Madden gave him the boots and requested he clean them; Williams returned to the bar; and Connor subsequently drove him to Madden's residence. Williams testified he later went home and upon learning the victim died, decided to clean the boots and destroy evidence pursuant to Madden's request; however, his mother would not allow it.

*State v. Madden*, 99 S.W.3d 127, 130-134 (Tenn. Crim. App. 2002).

## II. Post-Conviction Hearing

At the post-conviction hearing, Petitioner was the only testifying witness. As evident from the record, the testimony of Petitioner's trial counsel was not available because trial counsel was deceased at the time of the post-conviction hearing. Prior to retaining trial counsel, Petitioner was represented by Lionel Barrett for a period of two years. Petitioner retained trial counsel after filing a complaint against Mr. Barrett with the Board of Professional Responsibility.

Petitioner testified that he met with trial counsel only two times prior to trial. The jail records reflect that the first meeting occurred on September 22, 1999, for about an hour and twenty minutes. The second occasion was on November 16, 1999, for about thirty-five minutes. This was the last meeting before trial between Petitioner and his trial counsel. Petitioner testified that his trial counsel never discussed strategy with him, and they never discussed the charges against Petitioner or the elements of the offenses charged. Petitioner said that trial counsel did not talk to him about possible defenses or prepare him to give his testimony at trial, nor did he discuss a plea bargain with Petitioner. Trial counsel also did not visit Petitioner in the holding cell where he stayed during the course of the trial.

Petitioner testified regarding his lack of education. He explained that he attended school through the seventh grade, and he quit school in the eighth grade when he was removed from resource classes. Petitioner said that at least fifteen times during the trial, trial counsel asked Petitioner to tell him what the witnesses were saying. According to Petitioner, trial counsel specifically asked him what the forensic expert was testifying about. Petitioner said he really could not help trial counsel because "[b]y the time I was trying to explain to him what was asked, the witness had already answered and I couldn't keep up with him."

Petitioner testified that he never had a discussion with trial counsel about a pair of boots which were introduced at trial. Trial testimony established that the boots were essentially a weapon used in the homicide, and that Petitioner was wearing the boots during commission of the crime. The boots were introduced into evidence during the trial through a forensic expert who testified that the victim's blood was on the boots. Petitioner testified both at trial and at the post-conviction hearing that the boots were a size seven-and-a-half and Petitioner wore a size ten-and-a-half. He complained that he never had an opportunity to try on the boots in the presence of the jury. He likewise complained that trial counsel never discussed hiring a forensic expert to rebut the State's evidence that Petitioner had worn the boots.

Petitioner testified that trial counsel failed to cross-examine the State's witnesses. The trial transcript reflected that there were a total of fourteen prosecution witnesses, and trial counsel did not cross-examine seven of them. Trial counsel did not discuss the decision not to cross-examine the witnesses with Petitioner. Petitioner acknowledged that his co-defendant's trial counsel had the first opportunity to cross-examine each witness.

On cross-examination, Petitioner admitted that he never expressed to the trial court his dissatisfaction with trial counsel. He admitted that he was familiar with the procedure for filing a complaint because he had previously filed a complaint against his first attorney, Mr. Barrett. Petitioner stated that he testified at his trial, and he told the jury his version of what happened the night of the murder. Petitioner testified for the sole purpose of informing the jury of his version of the events which took place. Petitioner stated that he and trial counsel decided that he would testify in order to rehabilitate himself after the testimony of his co-defendant. Petitioner maintained that there was nothing he would change about his trial testimony despite the fact that the decision to testify was made the same day the testimony was given, and Petitioner was not prepared by trial counsel. He told the jury that he was not wearing the boots and that they were not his size.

The post-conviction court filed a written order denying post-conviction relief. *See* T.C.A. § 40-30-118 (1990). After individually addressing the issues raised by Petitioner, the trial court found that Petitioner failed to meet the standard justifying post-conviction relief. In denying his claim, the trial court stated:

> Within the larger ground of ineffective assistance of counsel, Petitioner has multiple issues related to that alleged ineffectiveness and has also alleged he received an unfair trial; however, he has failed to do so sufficiently to meet the clear and convincing evidentiary test required under Section 40-30-210(f) of the Tennessee Code. In addition, Petitioner has not demonstrated that he suffered any prejudice as a result of the alleged ineffective assistance.

On appeal, Petitioner argues that the trial court erred in finding that trial counsel's actions were not deficient. Specifically, Petitioner argues that trial counsel's performance was ineffective because he failed to meet with Petitioner during the eighty-eight days immediately prior to trial; failed to prepare Petitioner prior to or during trial for his trial testimony; failed to request that Petitioner try on the boots identified as the murder weapon; failed to cross-examine seven out of the State's fourteen witnesses; failed to discuss trial strategy and the elements of the crime charged; and failed to discuss a potential plea or the possibility of a plea bargain. He also asserts that trial counsel had difficulty hearing during the course of the trial which inhibited trial counsel's ability to provide competent representation. Petitioner argues that these failures are *per se* ineffective and amount to a "gross deviation from the standards required for counsel representing someone facing a felony murder charge." Petitioner further argues that "under the totality of the circumstances," there is a "reasonable probability" that if counsel had provided adequate representation, the outcome of the trial would have been different.

## III. Analysis

To be successful in his claim for post-conviction relief, the petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. *See* T.C.A. § 40-30-110(f) (2003). "Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) *(quoting Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 2 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. *See Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, we afford the post-conviction court's findings of fact the weight of a jury verdict, with such findings being conclusive on appeal absent a showing that the evidence in the record preponderates against those findings. *Id.* at 578.

A claim of ineffective assistance of counsel is a mixed question of law and fact. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) *(citing* Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d at 578). However, we will review the post-conviction court's conclusions of law purely de novo. *Fields*, 40 S.W.3d at 458. To prevail on a claim of ineffective assistance of counsel, the petitioner must establish that counsel's performance fell below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he must show that counsel's ineffective performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067, 80 L. Ed.2d 674 (1984). In order to show prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State*, 960 S.W.2d at 580. That is, a petitioner must not only show that his counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. *Id.* Failure to satisfy either prong will result in the denial of relief. *Id.* Accordingly, this Court need not address one of the components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

Petitioner argues that trial counsel's purported hearing difficulties combined with his overall deficient performance amounted to a total failure to subject the prosecution's case to meaningful adversarial testing. He argues that this failure rises to the level of *per se* ineffectiveness under *United States v. Cronic*, 466 U.S. 648, 658-62, 104 S. Ct. 2039, 2046-49, 80 L. Ed.2d 657 (1984), thereby raising a presumption of prejudice and precluding Petitioner from the need to prove the *Strickland* elements of ineffective assistance of counsel. Alternatively, Petitioner argues that considering the totality of the circumstances, under the rule of *Strickland*, there is a "reasonable probability" that the result of the trial would have been different but for trial counsel's ineffective performance.

The *Cronic* court identified three scenarios involving the right to counsel where the situation was "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658-660, 104 S. Ct. 2046-2048. In those particular instances, there is an irrebuttable presumption of prejudice, and the defendant need not meet the *Stickland* analysis to prove ineffective assistance of counsel. *Cronic*, 466 U.S. at 662, 104 S. Ct. at 2048. Those situations include: (1) the "complete denial of counsel," where the accused is denied the presence of counsel at "a critical stage;" (2) where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing;" and (3) situations "where counsel is available to assist the accused during trial, [but] the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Cronic*, 466 U.S. at 659-660, 104 S. Ct. at 2047.

Petitioner argues that trial counsel's performance constitutes prejudice *per se* under the second prong of *Cronic*. He cites several reasons in support of his assertion, arguing that the failure to cross-examine eight witnesses, failure to meet with Petitioner more than two times, with the last meeting being eighty-eight days prior to trial, failure to prepare Petitioner to testify, and failure to have Petitioner try on the boots in the presence of the jury, amount to a total lack of representation. He argues that there is no distinction between his trial counsel's purported hearing difficulties and a situation where counsel is absent from trial, or asleep during portions of the proceedings. He further argues that this purported inability to hear is the reason trial counsel did not cross-examine eight witnesses. Petitioner asserts that these deficiencies, in addition to trial counsel's failure to discuss "important decisions" with Petitioner regarding trial strategy and potential pleas or defenses, fall short of the minimal standards required by counsel representing a defendant on felony murder charges. According to Petitioner, this failure is equivalent to a complete denial of his Sixth Amendment right to counsel. We disagree with Petitioner.

In *Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002), the Supreme Court addressed the issue of when to apply the rule of *Strickland* and when to apply the rule of *Cronic* with respect to a claim of ineffective assistance of counsel. In finding that petitioner's claim was subject to a *Strickland* analysis, the Court explained:

> "When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure

must be complete. We said "if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing." *Cronic*, *supra*, at 659, 104 S. Ct. 2039 (emphasis added). Here, respondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points. For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind."

*Bell*, 535 U.S. at 697, 122 S. Ct. at 1851.

In accordance with the Court's analysis in *Bell*, we conclude that the errors alleged by Petitioner are subject to the rule of *Strickland*. The evidence in the record does not support Petitioner's assertion that trial counsel's alleged hearing difficulties and other problems amounted to a total lack of representation. Nor can we presume that trial counsel's choice not to cross-examine some of the witnesses was due to a hearing deficiency rather than simple trial strategy or because cross-examination was not necessary. In the instances where trial counsel chose to cross-examine the witnesses, his questions were relevant and demonstrated that he adequately heard and understood the witnesses' direct testimony. Trial counsel also made valid and relevant objections during the testimony of several witnesses, thus indicating his ability to hear testimony and his intent to challenge the prosecution's case. Additionally, there is no evidence in the record indicating that trial counsel actually suffered from a hearing impairment.

Although Petitioner asserts several grounds in support of his *per se* ineffectiveness claim, we find no evidence to support the contention that Petitioner was entirely without representation as contemplated by the Court's decision in *Cronic*. *See Cronic*, 466 U.S. at 659, 104 S. Ct. at 2039. Petitioner witnessed trial counsel's performance at trial and he was free at that time to question counsel's tactics or complain about his representation. His failure to do so, particularly in light of his having filed a complaint against his first attorney, indicated satisfaction with his representation. Likewise, if Petitioner wanted to try on the boots in the presence of the jury, he could have made that request to his trial counsel. There is no evidence that Petitioner made such a request. With respect to trial counsel's failure to prepare Petitioner to testify, we cannot find counsel deficient given Petitioner's admission at the post-conviction hearing that there was nothing he would change about his testimony at trial. For these reasons, we cannot conclude that Petitioner was *per se* prejudiced by trial counsel's performance. Therefore, we proceed with our analysis under the standards of *Strickland*.

As stated above, Petitioner makes several claims of ineffective assistance of counsel, but he fails to demonstrate that he suffered prejudice as a result of counsel's purported deficient performance. For instance, Petitioner claims that trial counsel was ineffective for failing to meet with him more than two times, the last meeting being eighty-eight days prior to trial. However, Petitioner failed to present evidence indicating that had he met with trial counsel with more frequency, additional favorable evidence would have been developed that would have changed the outcome of the trial. The post-conviction court's findings reflect that Petitioner's original attorney met with Petitioner multiple times, and that he provided Petitioner's second trial counsel with his

case notes. After a thorough review of the record, we are unable to find evidence to support the trial court's finding that notes were provided to trial counsel. Nevertheless, the evidence in the record does not preponderate against the post-conviction court's finding that Petitioner was not prejudiced by the infrequency with which he met with his second trial counsel.

Likewise, Petitioner argues that trial counsel did not properly prepare him to give his trial testimony, and did not discuss trial strategy or possible defenses with him. However, Petitioner offered no proof as to how discussion of any of these issues would have changed the outcome of the case. Petitioner, in fact, admitted that there is nothing about his trial testimony that he would alter or otherwise change. Petitioner also failed to submit evidence of a different trial strategy or assertion of other defenses that would have been feasible or possibly successful. Petitioner makes similar arguments that trial counsel failed to discuss plea bargains or potential plea bargains with him. However, Petitioner failed to present evidence that plea negotiations had taken place or that trial counsel had denied him the opportunity to accept a plea by failing to inform him of any negotiated plea offer by the State. In fact, the record contains no indication that the State ever offered Petitioner a plea agreement.

Petitioner also claims that trial counsel was ineffective for failure to cross-examine several of the State's witnesses. Petitioner claims that trial counsel's failure to cross-examine the witnesses was a direct result of his inability to hear the witnesses' testimony. Petitioner relied on various excerpts from the trial transcript which indicate trial counsel had difficulty hearing parts of testimony from some of the witnesses. However, Petitioner presented no evidence from fellow attorneys, family, staff, or others, that trial counsel had difficulty hearing at the time of the trial, or the extent to which he suffered any hearing impairment. Nor did Petitioner present evidence of what cross-examination should have been done by trial counsel had he been able to hear all of the testimony. Additionally, as the post-conviction court pointed out, the trial transcript and the testimony from the post-conviction hearing both establish that Petitioner always went second to his co-defendant when questioning witnesses. The record shows that his co-defendant's counsel cross-examined all but three of the State's fourteen witnesses. Petitioner's counsel also questioned seven of those witnesses. The post-conviction court posited that in those cases where he did not cross-examine, there may not have been a need for Petitioner's counsel to ask any further questions. In any event, Petitioner did not establish that he was prejudiced either by any hearing impairment of trial counsel, or his choice not to cross-examine some of the witnesses because Petitioner did not offer proof of any additional and necessary cross-examination not conducted by trial counsel.

Petitioner also claims that he was prejudiced by the fact that trial counsel did not request that Petitioner try on the boots in front of the jury. Petitioner argues that had it been conclusively shown that the boots did not fit, and therefore it was his co-defendant who both hit and kicked the victim, then the jury could easily have concluded that Petitioner was not guilty of felony murder. Petitioner's co-defendant, who implicated Petitioner, testified at trial that the boots were a size seven-and-a-half D, and that the boots belonged to the co-defendant who wore a seven-and-a-half, even though his co-defendant asserted that Petitioner was wearing the boots. Both Petitioner and his mother testified at trial that Petitioner wore a ten-and-a-half. Petitioner also denied that he

borrowed the boots from his co-defendant and denied that he was wearing them during the incident. Petitioner's father testified that he saw Petitioner's co-defendant wearing the boots the day of the murder. As such, the jury was aware of the dispute regarding who actually wore the boots. However, as noted by the post-conviction court, it was irrelevant who wore the boots because the State presented a theory of criminal responsibility and felony murder, and the jury chose to convict both Petitioner and his co-defendant.

"A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a) (2003). "A person is criminally responsible for the conduct of another if [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2) (2003). Under the theory of criminal responsibility a defendant's presence and companionship with the perpetrator of the crime before and after the crime are circumstances from which one may infer the defendant's direct participation. *See State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998) (citations omitted). The defendant need not have taken physical part in the crime; mere encouragement of the principal will suffice. *Id.*, *State v. McBee*, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982). To be criminally responsible for the acts of another, "[i]t is necessary that the defendant 'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (*quoting Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

Petitioner was convicted of especially aggravated robbery and felony murder. In order to show prejudice, Petitioner would have to show that there was a reasonable probability that the outcome of the trial would have been different had trial counsel requested that Petitioner try on the boots for the jury. *See Hicks v. State*, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998). Petitioner failed to make this showing. Indeed, Petitioner admitted at trial that he was involved in the altercation with the victim, that he kicked the victim, that he was wearing boots "almost identical" to the boots introduced into evidence, and that he then tried to destroy evidence of the crime by washing the victim's blood off of a pair of boots, albeit boots that he claimed were worn by his co-defendant. Petitioner also admitted that he assisted his co-defendant in taking the victim's money. At the post-conviction hearing, Petitioner further testified that he would not change anything about the testimony he gave at trial. This evidence was sufficient for a rational trier of fact to find that Petitioner was guilty of especially aggravated robbery and felony murder pursuant to a theory of criminal responsibility. We conclude that Petitioner has failed to show that he was prejudiced by trial counsel's failure to request that Petitioner try on the boots.

## CONCLUSION

For the foregoing reasons, we conclude that Petitioner failed to establish that he was prejudiced by trial counsel's actions during the course of his trial. Accordingly, Petitioner is not entitled to post-conviction relief on the grounds of ineffective assistance of counsel. The judgment of the post-conviction court is affirmed.

_____
THOMAS T. WOODALL, JUDGE