# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs March 16, 2004

## STATE OF TENNESSEE v. ANTHONY J. RAMEY

**Appeal from the Criminal Court for Sullivan County**
**No. S46,096     R. Jerry Beck, Judge**

---

**No. E2003-01840-CCA-R3-CD - Filed July 15, 2004**

---

The defendant, Anthony J. Ramey, appeals his jury conviction of aggravated sexual battery, a lesser-included offense of rape of a child with which he was originally charged. He claims (1) that the evidence presented at trial was insufficient to find him guilty of aggravated sexual battery; (2) that the trial court should have granted his motion for judgment of acquittal; (3) that the length of his sentence is excessive; (4) that the jury should have been instructed on the lesser-included offense of child abuse; and (5) that Code section 40-18-110(c), which requires a written request for an instruction on a lesser-included offense, is unconstitutional. Upon review, we are unpersuaded by the defendant's arguments and, accordingly, affirm his conviction and sentence.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

Stephen M. Wallace, District Public Defender, and Terry Jordan and Joseph F. Harrison, Assistant Public Defenders, Blountville, Tennessee (at trial), and Julie A. Rice, Knoxville, Tennessee (on appeal), for the Appellant, Anthony J. Ramey.

Paul G. Summers, Attorney General & Reporter; Brent C. Cherry, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and James F. Goodwin, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

In the light most favorable to the state, the evidence introduced at trial showed that KS,[1] a female, was born July 20, 1993. At the time of the charged offense in 2000, the victim was

---

[1] It is the policy of this court to refer to minor victims of sex crimes by initials only.

seven years old, and at the time of trial, she was nine years old. Up until May 2001, KS had lived with her mother; however, in May 2001, KS moved to North Carolina to live with her grandmother.

KS testified that she attended kindergarten at Lincoln Elementary in Kingsport. For first and second grade, she was enrolled at Andrew Jackson Elementary. KS could not recall her home address when she attended Lincoln Elementary. She did, though, remember moving to Clinchfield Street in Kingsport, because after the move, she changed schools. Her home address on Clinchfield was an apartment that was part of a duplex. At first, KS lived at the apartment with her mother and her younger brother and sister. Later, the defendant came to live with them. KS said that the defendant helped care for her and the other two children.

Prosecution counsel directed the victim's attention to a school counselor, Ms. Morrison, who worked at Andrew Jackson Elementary. KS testified that Ms. Morrison came to class one time and read a story about "sweet and sour secrets." KS explained that a sour secret "is a bad secret" and that a sweet secret "is a good secret." KS estimated that "a couple of days later" she approached Ms. Morrison about a sour secret and told Ms. Morrison that "somebody was doing something bad" to her. As a result, Detective Kindle came to the school to investigate. The victim testified that she first told her mother about the secret a "couple of days" after speaking with Ms. Morrison. Detective Kindle spoke with KS's mother, after which KS's mother scheduled a medical examination. The victim stated that the doctor examined her and that she told the doctor what had happened.

When asked at trial to repeat her sour secret, the victim said it involved the defendant touching her "private parts." For her, "private parts" encompassed "upper parts and your bottom." By "bottom," KS was referring to both orifices on her lower torso. KS testified that the defendant touched the "front part" of her "bottom." The touching occurred, the victim said, after her mother had gone to work, which would have been very early morning.

Prosecution counsel next directed the victim's attention to the beginning of the second grade school year in 2000. KS testified that about the time school started, the defendant "was touching [her] in the wrong places." She elaborated that "one time it happened in [her] bedroom, and the rest happened in [her] mom's bedroom." KS sometimes slept in her mother's bedroom, usually wearing a tee shirt and underwear. Asked whether the defendant touched outside her clothing or underneath, the victim said "sometimes" the defendant inserted his hand underneath her underwear.

Regarding the victim's bedroom, she testified that all three children slept in the same room, which contained a set of bunk beds and a single bed. On one occasion, she was in the bottom bunk bed when the defendant came into the room and got under the covers with her. KS said that the defendant "started touching [her] again" on the "front part" on the "bottom." "Sometimes," she stated, it hurt when he touched her private parts. When asked if she knew what penetration meant, the victim responded that she did not; however, in response to a follow-up question whether the

defendant "went inside" her, KS answered that it happened "[s]ometimes," but "[n]ot all the time." She believed that it happened when the defendant got into the bunk bed with her.

As for the mother's bedroom, the victim explained that sometimes she and the other children would stay awake at night instead of going to sleep. When that happened, their mother would separate them by putting one of the children in the mother's bed. KS recalled that after the other children went to sleep, her mother would wake and send KS back to the children's bedroom. According to KS, the defendant did not get into the bed with her mother until KS left the room.

In terms of specific sexual contact that occurred in the mother's bedroom, the state elicited the following testimony:

> Q Okay. Was your mom in the bed with you when [the defendant] got in the bed with you in your mom's room?
>
> A No.
>
> Q Did he get in the bed with you in your mom's room?
>
> A Yes.
>
> Q What happened when he got into the bed with you?
>
> A He started touching me.
>
> Q Where did he touch you?
>
> A In my private parts.
>
> Q Can you describe how he touched you?
>
> A He would stick his finger inside of me.
>
> Q Did it hurt?
>
> A Yes.
>
> Q Did he say anything to you?
>
> A I don't think so.
>
> Q Did he ever ask you to touch him in any way?

A       Yes.

Q       What did he ask you to do?

A       He would tell me to touch his private parts.

Q       And would you?

A       He would take my hand and start to put it there.

Q       What happened when he did that?

A       I yanked it away.

Q       Did he have his clothes on?

A       I think he was just in his underwear.

Q       Can you describe what his private part looked like?

A       It was hairy.

Q       Did you touch it?

A       Only once.  He just –

Q       What did it feel like?

A       It would feel like squishy.

Q       Did anything come out of it?

A       I don't think so.

Q       Did this happen in any other room in the house?

A       No.

In terms of other inappropriate conduct, the state elicited from the victim that before the defendant ever touched her, he showed her a movie "with naked people in bed." The people were kissing, and KS only watched a bit of the beginning before waking her mother to complain that the defendant was showing her "a bad movie." Her mother told her to go to her own room. According to KS, nothing similar happened again.

On cross-examination, the defense elicited from KS that the "activity" had been going on since the defendant moved into the apartment with her family. KS believed that she was in the first grade at the time of the defendant's move. In terms of frequency of the touching, KS stated, "Only when my mom went to work in the mornings. He never really did it at night except for once."

Doctor John Heise, who examined KS, was accepted at trial as an expert in pediatric medicine. He testified that the Children's Advocacy Center and the Department of Human Services referred KS to him for an examination to determine if she had been sexually molested. Doctor Heise performed that examination on September 29, 2000, at which time KS was seven years, two months old.

Doctor Heise testified that he elicited an oral history from KS regarding what had happened. Dr. Heise testified that KS easily admitted that the defendant had touched her private parts, including her vagina, with his finger and hand. With more specific questioning, KS explained that the defendant had put his finger inside several times. Concerning duration, KS told Dr. Heise that "this had been going on for some time, and usually occurred at home, when mother was at work." KS also informed Dr. Heise that this occurred "almost" every day and had been occurring since the defendant had moved into the household.

From his examination, Dr. Heise concluded that KS was pre-pubertal. As far as the genital examination, KS's hymen was intact but a little unusual in that it "appeared somewhat stretched lengthwise." Although Dr. Heise agreed that the stretching could be consistent with digital penetration, he could not say to a medical certainty what caused the stretching, particularly because many different things could have been responsible.

In defense of the child rape charge, the defendant testified and presented testimony from his brother, from KS's mother, and from the director and a child care employee with The Play Center Nursery School in Kingsport where the victim and her siblings had been enrolled part time in 1999, 2000, and 2001.

The defendant's brother, who is not married but has two children, testified that for a six- to eight-month period, he and his children lived next door to his brother on Clinchfield. The brother's children and KS and her siblings played together and visited in each other's homes. While the brother was living on Clinchfield, he would see KS almost daily. The brother testified that he observed KS in the defendant's presence and that he never observed anything unusual.

KS's mother testified that she and the children's father separated in January of 1999 owing to his drinking and abuse. Long before the separation, KS's mother had met the defendant, and the two had remained friends. KS's mother related that she and the defendant began cohabiting in February of 1999 at the Clinchfield apartment. She and the children were already living at the apartment when the defendant joined them. KS's mother was working the breakfast shift at Burger King and was responsible for opening the store. Her working hours were 5:00 a.m. until 2:00 p.m. The defendant was working at night, and often he would be responsible for getting the children to

school.  Usually, she was able to pick up the children after school, but at some point, the children were taken to child care.  KS's mother could not remember exactly when she had child care assistance.

KS's mother confirmed her daughter's testimony about the defendant playing a pornographic video tape in the victim's presence.  KS's mother explained that she sent her daughter to the children's bedroom, after which she threw away the tape.  KS's mother stated that she was unaware that the tape existed, and no other similar video tapes were in their house.

KS complained to her mother about the defendant on September 25, 2000.  The mother testified that prior to that date, KS had never cried or been upset when left with the defendant, nor had KS ever exhibited any fear of the defendant.  KS complained to her that the defendant had touched her private part.  KS's mother said that she was very disturbed by the allegations, but Dr. Heise reported that he found no physical evidence.  Since the allegations were made, the defendant had not had any contact with KS.

On cross-examination, the state questioned KS's mother about her contact with the defendant.  She insisted that she had spoken with the defendant on a couple of occasions but had not gone to see him.  The state also quizzed her about her failure to arrange for counseling for KS.  The mother explained that Detective Kindle had contacted her in December about taking KS for counseling, that she had called to get counseling scheduled, but that when Detective Kindle recontacted her in February, the counseling center had not called back with a schedule.

The defense offered the testimony of Betty Smith and Jacqueline Dunn to establish that KS was enrolled in The Play Center Nursery School in Kingsport from July of 1999 until January 2000 and from October of 2000 until June 2001.  Ms. Smith, the director of the nursery school, also testified that KS never complained to her about home life, and Ms. Smith observed no difference in KS's behavior during and between the times she was enrolled.  Ms. Dunn, a child care worker at the nursery school, described the victim as happy and energetic.  Ms. Dunn, likewise, noticed no changes in KS's behavior.

The defendant, who was 32 years old at the time of trial, testified that he grew up in Kingsport and knew the victim's mother and father when they were married.  At the time the married couple separated, the defendant was struggling financially, as was KS's mother.  The defendant said that he proposed cohabiting temporarily until they could "get on their feet."  The defendant helped with the children, and he described his relationship with KS as good.

The defendant related that he was at work on September 25 when the victim's mother called to relay KS's complaint that he had touched her.  The defendant left work early to try to find out what was happening.  The next day, he and the victim's mother were contacted by Detective Kindle, and they went to the police department to be interviewed.  In his interview, the defendant denied that anything had happened.  He admitted that when he was watching a pornographic video tape, the victim came into the living room where the television was located.  The defendant

explained to Detective Kindle that when he noticed the victim in the room, he took the tape out of the machine, and the victim's mother threw away the tape.

The defendant said that after his police interview, he was instructed to have no contact with the children. He was given only four hours to remove his belongings from the apartment, and he had not communicated with the children since that time. The defendant did, however, admit that he had limited contact with the victim's mother but never in the presence of the children. He believed that the children were staying with the grandparents because the victim's mother was having financial difficulties.

As part of his testimony, the defendant denied ever touching the victim's private parts or having the victim touch his penis. He also denied ever fondling or inserting his finger inside the victim's private parts.

At the close of the case, the trial court required the state to elect which incident it was relying upon to establish the charged offense. The state elected an incident just prior to school starting in 2000 when the defendant got into bed with the victim in the mother's room, touched the victim's private parts, and inserted his finger inside the victim, which the victim described as hurting or painful.

From the evidence and the state's election, the jury deliberated and found the defendant guilty of the lesser-included offense of aggravated sexual battery. At a separate sentencing hearing, the trial court imposed an incarcerative ten-year sentence. Aggrieved by his conviction and sentence, the defendant has appealed.

**I.**

The defendant leads with the complaint that his conviction is infirm because the evidence at trial was legally insufficient to find him guilty of aggravated sexual battery. He also asserts that the trial court erroneously denied his motion for judgment of acquittal.[2] Inasmuch as "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction," *State v. Thompson*, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000), we will consolidate the defendant's first two issues, *see State v. Price*, 46 S.W.3d 785, 818 (Tenn. Crim. App. 2000); *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998).

In reviewing the legal sufficiency of the convicting evidence, this court is required to favor the state with the strongest legitimate view of the evidence, which includes all reasonable

---

[2] The judgement of acquittal motion to which the defendant refers pertains to the indicted charge of rape of a child, not the conviction offense of aggravated sexual battery. Inasmuch as the jury acquitted the defendant of rape of a child by returning a guilty verdict on the lesser-included offense, the trial court's rejection of the defendant's motion is of no consequence at this juncture.

inferences drawn therefrom, to discard any countervailing evidence, and then determine whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *State v. Carter*, 121 S.W.3d 579, 588 (Tenn. 2003); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). On appeal, the defendant no longer enjoys the presumption of innocence and, therefore, has the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000)*; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Although originally charged with rape of a child in violation of Code section 39-13-522, the defendant was convicted of the lesser-included offense of aggravated sexual battery in violation of Code section 39-13-504. *See* Tenn. Code Ann. §§ 39-13-522, 39-13-504 (2003). As pertinent to this case, aggravated sexual battery "is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: . . . (4) The victim is less than thirteen (13) years of age." *Id*. § 39-13-504(a)(4) (2003). By definition, "sexual contact" includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification. *Id*. § 39-13-501(6) (2003). "Intimate parts" is defined to include the primary genital area, groin, inner thigh, buttock, or breast of another. *Id*. § 39-13-501(2) (2003).

With respect to his conviction, the defendant insists there is no evidence of a specific event and that the victim's testimony did not "pin down" even any general dates for any particular allegations of abuse. The defendant, thus, argues that the proof is insufficient to sustain his conviction. The supreme court, however, has expressly rejected this argument. In *State v. Brown*, 992 S.W.2d 389 (Tenn. 1999), the court explained,

> The State is not required to prove that an offense was committed on a specific date unless the date is an element of the crime or essential to proving the offense. *State v. Byrd*, 820 S.W.2d 739, 741-42 (Tenn. 1991). The election doctrine only requires the State to select which of multiple offenses in evidence it relies upon to seek the conviction to ensure that the jury focuses on and is unanimous with respect to that conviction. Therefore, the remedy for the State's failure to satisfy the election requirement is a new trial and not a dismissal due to insufficient evidence.

*Brown*, 992 S.W.2d at 392.

Although miscast as an evidence sufficiency matter, the defendant's argument does fairly challenge the efficacy of the state's election of an offense in this case on the ground that it was not sufficiently specific to ensure a unanimous verdict. We note that the state's brief on appeal discusses the matter in terms of the state's offense election. Accordingly, we shall consider whether

the state's attempt to elect an offense in this case was adequate and, if not, whether the defendant is entitled to a new trial.

We begin with an overview of the pertinent legal principles. The law is settled that the prosecution must elect the facts upon which it is relying to establish the charged offense, if evidence is introduced at trial indicating that the accused has committed more offenses against the victim than were charged. *See State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001); *State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *Brown*, 992 S.W.2d at 391; *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). Most often, the election requirement arises in the sex-crimes context when a defendant is alleged to have performed multiple sexual acts over a lengthy period of time against young children who are unable to provide the exact date on which any one act occurred. *See Johnson*, 53 S.W.3d at 631; *Brown*, 992 S.W.2d at 389. "The election requirement safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." *Johnson*, 53 S.W.3d at 631.

Without question, the state introduced evidence in this case that the defendant had committed multiple offenses against KS, thereby triggering the state's obligation to elect the particular offense for which a conviction was sought and the trial court's responsibility to instruct the jury so that it deliberated over and returned a verdict for a particular offense. The state neither contested nor sought to shirk its obligation, and the trial court, for its part, discussed at length with the parties the wording of the jury instruction on offense election that would be given. These efforts, as we shall explain, were sufficient in our opinion to ensure jury unanimity.

Pretrial, the defense sought a bill of particulars from the state of the date, time, and location of the charged offense. The state responded that it was unable to provide a specific date and time; however, the state believed that the defendant "digitally penetrated the victim every day that the victim's mother worked during the months of August and September 2000" and that the child's mother worked the breakfast shift at Burger King. The state specified the location to be 501 A Clinchfield Avenue.

Initially, we observe that the state's response was not fatal to the continuation of the prosecution. *State v. Byrd*, 820 S.W.2d 739 (Tenn. 1991) (upholding a presentment even though state was unable to designate in a bill of particulars specific dates on which the charged offenses were alleged to have occurred). That said, the prosecution was, nevertheless, on notice that it needed to prepare and present its case at trial so that an election could be made before the matter was submitted to the jury. That young victims of child abuse may not be able to testify that abuse occurred on a specific date is a recognized phenomenon creating practical difficulties in applying the election requirement. *See, e.g.*, *Brown*, 992 S.W.2d at 393. Nevertheless, the state has at its disposal multiple alternatives to combat these practical difficulties.

> If, for example, the evidence indicates various types of abuse, the prosecution may identify a particular type of abuse and elect that offense. . . . Moreover, when recalling an assault, a child may be able

to describe unique surroundings or circumstances that help to identify an incident. The child may be able to identify an assault with reference to a meaningful event in his or her life, such as the beginning of school, a birthday, or a relative's visit. Any description that will identify the prosecuted offense for the jury is sufficient.

*State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993) (citation omitted) (footnote omitted).

In this case, KS testified about a course of sexual abuse beginning soon after the defendant moved in with her family in February of 1999 and ending on September 26, 2000, when Detective Kindle instructed the defendant to move out of the apartment and to have no contact with the children. KS testified in general terms about the defendant touching her private parts, which she described as "the front part of her bottom." "Sometimes," according to KS, the defendant would touch her underneath her clothing by "kind of stick[ing] his hand underneath [her] underwear." "Sometimes," again according to KS, the touching "hurt" and "sometimes," but not always, the defendant "would stick his finger inside of [her]." On cross-examination, KS indicated that the touching occurred "[o]nly when [her] mom went to work in the mornings" and that the defendant "never really did it at night except for once."[3]

From KS's testimony, it appears that the children's bedroom and her mother's bedroom were the only rooms in the apartment where the touching occurred. KS described one encounter in the bunk bed in the children's bedroom when the defendant got under the covers and started touching her private parts. The state asked if the defendant went inside her when he got into the bunk bed, and KS replied, "I think it did."

Regarding a possible election based on the type of abuse involved, it is evident from the foregoing that as many as three different types of abuse were involved: (1) touching the outer clothing covering KS's intimate parts, (2) touching KS's intimate parts underneath KS's underwear, and (3) touching KS's intimate parts accompanied by digital penetration. Inasmuch as the state was pursuing a conviction for child rape, it logically was looking to elect an offense involving "sexual penetration." *See* Tenn. Code Ann. § 39-13-522 (2003). Because, however, the only type of sexual penetration that KS described was digital, no meaningful election was possible on that basis.

A particular offense could have been isolated, in our opinion, based on unique surroundings. KS testified that the touching happened "only one time" in her bedroom when she was in the bottom bunk bed. Our review of the record persuades us that an election was not made on that basis because both the state and the trial court incorrectly believed that the touching on that occasion did not involve digital penetration. At one point, for instance, the trial court remarked,

And she really only described two specific events that I remember, and I want to hear you on this if you think I'm wrong, is she described a

_____

[3] Neither the state nor the defense tried to elicit from KS what happened on that one occasion at night.

-10-

bunk bed where she's not sure if he put something digitally or otherwise in it. . . . Then she goes to the mother's bed and specifically describes a, a digital penetration.

That view is contradicted by KS's testimony before us wherein the following exchange appears:

Q       Do you know what I mean if I ask you if he went inside you anyway?

A       I think I would.

Q       Did that ever happen?

A       Sometimes.  Not all the time.

Q       Did it happen *when he got into the bunk bed with you*?

A       *I think it did.*

(Emphasis added.)

Of the possible alternatives suggested in *Shelton*, the state in this case settled on a combination of surroundings and a meaningful event in the child's life.  Specifically, at the close of its proof, the state announced its election in the following fashion:

Your Honor, we'll, we'll be glad to elect at this point in time. According to my notes and -- the victim very clearly stated that at one point prior, just prior to school starting in 2000, that the Defendant got in bed with her in her mother's room, touched her private parts, stuck his finger inside of her and that it hurt.  And we will be relying and arguing that incident.

During closing arguments, the state then emphasized details based on KS's testimony to further identify and isolate the occasion.

She described how [the defendant] put his hand down into her underwear into her little panties, touched her private.  She's doesn't even know the proper word for her anatomy yet.  Touched her, rubbed her, put his finger in her, and it hurt, and how he had her touch him, and it was hairy, and it was squishy.

-11-

To be sure, it could have been helpful had the state attempted to clarify KS's testimony or draw out additional details. Nonetheless, the state's articulation of its offense election in this case was sufficient. Significantly, KS's testimony was not riddled with inconsistencies as was the victim's testimony in *Brown* wherein an insufficient election resulted in a new trial. *See Brown*, 992 S.W.2d at 392. In *Brown* the court emphasized the victim told the police that abuse had occurred twice, then testified initially that the defendant had digitally penetrated her five times during one visit in his trailer, and later claimed that the acts of digital penetration happened five times on different days. *Id*. The state's failure to clarify the conflicts in the victim's testimony, failure to reference a specific offense, and reliance on a two-month time frame to isolate the offense proved inadequate to focus the jury's attention on a single offense. *Brown*, therefore, in our opinion is inapposite. Also significant, the prosecution did not, as in *State v. McCary*, 119 S.W.3d 226, 242 (Tenn. Crim. App. 2003), *perm. app. denied* (Tenn. 2003), claim in closing argument that the state had proved at least one instance of sexual contact during each time frame, while commenting that "certainly there was a lot more than what we're talking about."

Even if we were convinced that the state's election in this case was inadequate, we are confident that the failure is harmless beyond a reasonable doubt. In situations wherein a young victim specifically identifies one incident of sexual contact and testifies generally or by minor references to other instances, harmless error analysis is appropriate. *See State v. Howard W. Weaver*, No. E2000-00066-CCA-R3-CD, slip op. at 7 n.5 (Tenn. Crim. App., Knoxville, Mar. 1, 2001) (noting in *dicta* that failure to elect may result in harmless error when victim unable to describe offenses except in conclusory way and defendant denies all wrongdoing), *perm. app. denied* (Tenn. 2001); *State v. Ellis*, 89 S.W.3d 584, 596 (Tenn. Crim. App. 2000) ("This court has previously observed that harmless error analysis may be appropriate when a victim specifically identifies one incident of sexual abuse and testifies generally about other instances."); *State v. Kenneth Lee Herring*, No. M1999-00776-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Nashville, Aug. 24, 2000) (failure to properly elect harmless error when victim testified with particularity about first instance of touching and tickling and other references to touching were in very general terms; jury must have been relying on one particular instance in finding defendant guilty).

Here, the state told the jury during closing arguments that it was electing the incident wherein the victim related how the defendant touched her, rubbed her, put his finger in her, and how he had her touch his penis, which the victim described as "hairy" and "squishy." This particularized testimony was specific to a single incident, and because other references to inappropriate touching were in very general terms, the jury must have been relying on this specific incident in reaching its verdict. Consequently, any possible error in the election of an offense in this case was harmless.

## II.

For his next issue, the defendant maintains that the trial court erred in refusing to consider for sentencing mitigation a favorable sex offender evaluation and in imposing a mid-range sentence of ten years. The defendant does not advocate a specific term of years but, rather, submits that something less than ten years is warranted. The state does not specifically address the length of

-12-

the sentence imposed, but it does argue that the sex offender evaluation was properly rejected because it should be considered solely in the context of probation or alternative sentencing determinations.

This court's review of the sentence imposed by the trial court is *de novo* with a presumption that the trial court's findings are correct. Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). If the trial court neglects to follow these statutory directives, our review is *de novo* with no presumption of correctness. *State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997). The burden is upon the appealing party to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d) (2003), Sentencing Comm'n Cmt.

When determining or reviewing a sentence, courts must consider: (1) evidence received at trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence offered by the parties on the enhancement and mitigating factors; (6) any statement the defendant wishes to make in the defendant's behalf about sentencing; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103(5), -210(b) (2003); *Ashby*, 823 S.W.2d at 169. If the trial court has imposed a lawful sentence by following the statutory sentencing procedure, has given due consideration and proper weight to the factors and sentencing principles, and has made findings of fact adequately supported by the record, this court may not modify the sentence even if it would have preferred a different result. *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The jury convicted the defendant of aggravated sexual battery, a Class B felony. Tenn. Code Ann. § 39-13-504(b) (2003). He was classified as a Range I offender, for which his sentencing range was eight to twelve years with a release eligibility of one hundred percent. *Id*. §§ 40-35-112(a)(2), -35-501(i)(1), (2)(H) (2003). The "presumptive" sentence for a Class B offense is the minimum in the range. *Id*. § 40-35-210(e) (2003). The trial court sentenced the defendant to an incarcerative term of ten years. The trial court applied two sentencing enhancement factors for prior criminal record and abuse of private-trust position. *See id*. § 40-35-114(2), (16) (2003). The defendant does not contest the applicability of these factors.[4] In mitigation, the court considered the

---

[4]We note that in *Ralph Howard Blakely v. Washington*, No. 02-1632 (U.S. June 24, 2004), the United States Supreme Court applied the principle of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000) that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Ralph Howard Blakely*, slip op. at 5; *see Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2362-63. In striking down an "exceptional," higher-than-standard sentence in *Ralph Howard Blakely*, the Supreme Court held that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Ralph Howard Blakely*, slip op. at 7 (emphasis in original). As such, the "statutory maximum" is the "maximum [sentence the judge] may impose *without* any additional [factual] findings." *Id*. (emphasis in original). We further recognize that the rule in *Ralph Howard Blakely* may well obliterate Tennessee's procedure for determinate sentencing by a judge utilizing statutory enhancement factors. *See* Tenn. Code Ann. § 40-35-114 (enumerating statutory enhancement factors). If so,

(continued...)

-13-

defendant's employment record and education efforts, which the court noted "deserve[d] very little weight in light of the overwhelming or great enhancing factors." The court declined to consider an assessment report from Counseling and Consultation Services evaluating the defendant "as a low to moderate risk to re-offend."

The state is correct that the Criminal Code requires that "each sex offender who is to be considered for probation or any other alternative sentencing shall be required to submit to an evaluation for treatment, risk potential, procedures required for monitoring of behavior to protect victims and potential victims, and an identification under the procedures developed pursuant to § 39-13-704(d)(1)." *See id*. § 39-13-705(a) (2003). The state, likewise, is correct that the defendant in this case was not eligible for probation or other form of alternative sentencing. *See id*. § 40-35-303(a) (2003) (defendant shall not be eligible for probation if convicted, *inter alia*, of aggravated sexual battery). That said, the statutory scheme is somewhat ambiguous regarding consideration of the evaluation for other sentencing purposes. Subsection (a) of 39-13-705 clearly provides that sex offenders are required to submit to an evaluation, if they are to be considered for probation or alternative sentencing. *See id*. § 39-13-705(a) (2003). Subsection (b), however, provides,

> (b) Those offenders *found guilty at trial* or who *pled guilty without an agreement as to length of sentence* and/or probation and/or alternative sentencing that are to have pre-sentence report prepared for submission to the court *shall be required to submit to the evaluation* referred to in subsection (a). Such evaluation shall be included as part of the pre-sentence report and *shall be considered by the court in determining the sentencing issues stated in this section*. If the court grants probation or alternative sentencing, any plan of treatment recommended by such evaluation shall be a condition of the probation or alternative sentencing.

*Id*. § 39-13-705(b) (2003) (emphasis added). The emphasized language suggests that the evaluation should be considered in determining the length of the sentence. *But see State v. Daniel Lovell Brown*, No. 03C01-9709-CC-00410, slip op. at 9 (Tenn. Crim. App., Knoxville, Nov. 12, 1998) ("Because a sex offender sentenced to the Department of Correction will be evaluated once in its custody, any evaluation at the trial level of an offender ineligible for probation or any other alternative sentence would constitute a duplication of professional and financial resources."), *perm. app. denied* (Tenn. 1999).

At any rate, nothing in Code section 39-13-705 purports to limit the sentencing court's authority, pursuant to the so-called "catch all" factor, to consider in mitigation "[a]ny other factor

---

[4](...continued)
and if *Ralph Howard Blakely* is determined to be applicable to the present case, the judge's application of the abuse-of-private-trust enhancement factor violates the defendant's right to jury trial. *See Ralph Howard Blakely*, slip op. at 9-10. We believe that in that circumstance, however, the application in the present case of the *Apprendi*-approved history of prior convictions alone justifies the defendant's mid-range sentence.

consistent with the purposes of this chapter." *See* Tenn. Code Ann. § 40-35-113(13) (2003). Nonetheless, even if the defendant were entitled to sentencing mitigation based on the assessment report from Counseling and Consultation Services, it would not lead to a reduction in this defendant's sentence. The weight given to each enhancement or mitigating factor is within the discretion of the trial court, assuming the trial court has complied with the purposes and principles of the sentencing act and its findings are supported by the record. *State v. Madden*, 99 S.W.3d 127, 138 (Tenn. Crim. App. 2002); *State v. Zonge*, 973 S.W.2d 250, 259 (Tenn. Crim. App. 1997). The statutes prescribe no particular weight for an enhancement or mitigating factor. *State v. Gosnell*, 62 S.W.3d 740, 750 (Tenn. Crim. App. 2001). We conclude the trial court was well within its discretion to attribute significant weight to the defendant's prior criminal record and abuse of private trust and to ascribe little weight to his employment record and education effort. Although the trial court erred in failing to consider the assessment report, we conclude that the mid-range sentence imposed was clearly justified. The defendant is not entitled to relief on this issue.

### III.

Next, the defendant maintains that he is entitled to a new trial based on the lower court's failure to instruct the jury that it could consider the lesser-included offense of child abuse. By way of background, the record reveals that, without objection from the state or defense, the trial court instructed the jury on the charged offense of rape of a child and the lesser-included offenses of attempted rape of a child, aggravated sexual battery, attempted aggravated sexual battery, and assault by offensive touching.

The jury returned its verdict prior to the release of the decision in *State v. Elkins*, 83 S.W.3d 706 (Tenn. 2002), in which the supreme court held that child abuse is a lesser-included offense of rape of a child and that Class B misdemeanor assault and child abuse are not alternative lesser-included offenses. Reacting to *Elkins*, the defendant submitted as a ground for new trial the instructional failure to include child abuse among the lesser-included offenses for the jury's consideration. At the new trial motion hearing, the trial court acknowledged error in the instructional omission and proceeded to analyze the harmful/harmless aspect of the error. It concluded that the error was harmless, because the jury had acquitted the defendant of child rape by digital penetration and the only arguable child-abuse "injury" occurred in connection with that same digital penetration, which the victim described as hurting.[5]

We, likewise, are persuaded that error in the failure to instruct on child abuse was harmless. Harmless error in connection with the failure to charge lesser-included offenses must be shown "beyond a reasonable doubt." *State v. Ely*, 48 S.W.3d 710, 727 (Tenn. 2001). The pertinent question is "whether it appears beyond a reasonable doubt that the error did not affect the outcome

---

[5] Tennessee Code Annotated section 39-15-401(a) defines child abuse in pertinent part: "Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury . . . commits a Class A misdemeanor." Tenn. Code Ann. § 39-15-401(a) (2003).

of the trial." *State v. Allen*, 69 S.W.3d 181, 191 (Tenn. 2002). In making the harmless error assessment, this court must "conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." *Id.*

From the decision in *Allen,* we know that a lesser-included offense error ordinarily is harmless "when the jury, by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, necessarily rejected all other lesser-included offenses." *Id.* at 189. In the present case, the jury considered and rejected two immediately lesser offenses of aggravated sexual battery -- (1) attempted aggravated sexual battery and (2) assault by offensive touching. Moreover, by acquitting the defendant of the charged greater offense of child rape, the jury signified its rejection of the state's theory of digital penetration. As no source other than digital penetration would account for the injury component of child abuse, we believe that the jury would not have found the defendant guilty of child abuse even if given the opportunity. In our opinion, the failure to instruct on the offense of child abuse was, accordingly, harmless.

### IV.

In his final issue, the defendant mounts a luke-warm challenge to the constitutionality of a portion of the statutory scheme that addresses lesser-included offenses. Specifically, the defendant argues the unconstitutionality of the following provision:

> (c) Notwithstanding any other provision of law to the contrary, when the defendant fails to request the instruction of a lesser included offense as required by this section, such instruction is waived. Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal.

Tenn. Code Ann. § 40-18-110(c) (2003). That subsection is part of a 2001 legislative amendment of section 40-18-110, governing all trials conducted on or after January 1, 2002. The state, not surprisingly, insists that no constitutional infirmity exists.

We can quickly dispose of this issue, because we need not reach the constitutionality of the statute. In the present case, the trial court fully considered the defendant's post-trial complaint that child abuse was not charged as a lesser-included offense. The defendant's complaint, in other words, was not rejected as having been waived for failure to submit a written request. There is no live controversy for us to consider, and it is well settled that "[t]he courts of this State have no right to render an advisory opinion." *State ex rel. Lewis v. State*, 208 Tenn. 534, 347 S.W.2d 47, 48 (1961).

### V.

In summary, we conclude that the state's election of an offense in this case was sufficiently specific to ensure a unanimous verdict. Additionally, we affirm the sentence imposed in

this case, as the defendant has not carried his burden to show its impropriety. Finally, we conclude that although the failure to instruct the jury that it may consider the lesser-included offense of child abuse was error, that error was harmless beyond a reasonable doubt. Accordingly, we affirm the conviction and sentence in this case.

_____
JAMES CURWOOD WITT, JR., JUDGE