# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Remanded by Supreme Court June 20, 2005

## STATE OF TENNESSEE v. JOHN C. WALKER, III

### Appeal from the Circuit Court for Putnam County
### No. 02-0306     Lillie A. Sells, Judge

---

### No. M2005-01432-CCA-RM-CD - Filed July 28, 2005

---

This case is before us after remand by the Tennessee Supreme Court. The Appellant, John C. Walker, III, was convicted of second degree murder and sentenced to twenty-five years. On direct appeal, this court originally affirmed the conviction and sentence. See State v. John C. Walker, III, No. M2003-01732-CCA-R3-CD (Tenn. Crim. App. at Nashville, filed Aug. 11, 2004). Subsequently, this court granted the Appellant's motion to rehear, pursuant to Tennessee Rule of Appellate Procedure 39, as to the application of enhancement facts, in light of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004). Upon rehearing, the Appellant's sentence was reduced to twenty years due to Blakely violations in the application of enhancement factors. See State v. John C. Walker, III, No. M2003-01732-RC-CD (Tenn. Crim. App. at Nashville, filed Feb. 8, 2005), perm. to appeal granted (Tenn. June 20, 2005). Subsequently, our supreme court released the case of State v. Edwin Gomez and Jonathan S. Londono, No. M2002-01209-SC-R77-CD, ____ S.W.3d ____ (Tenn. Apr. 15, 2005). Therein, the court concluded that Tennessee's sentencing structure is not impacted by Blakely. This case has now been remanded to this court for reconsideration in light of Gomez. See State v. John C. Walker, III, No. M2003-01732-SC-R11-CD (Tenn. at Nashville, June 20, 2005). After our review in light of State v. Gomez, we affirm the conviction and sentence as imposed by the trial court.

### Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

David N. Brady, District Public Defender, and John B. Nisbet, III, Assistant Public Defender, for the appellant, John C. Walker, III.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; William E. Gibson, District Attorney General; and Anthony J. Craighead, Assistant District Attorney General, for the appellee, State of Tennessee.

**Facts**

This case involves the January 5, 2002, fatal midnight shooting of Dale Randolph at the Star Motor Inn Lounge in Cookeville. Lori Tharp, a witness to the shooting, arrived with some friends at the Star Lounge at approximately 11:30 on the night of January 5th. She testified that she had known the victim for five or six years. She also stated that she had noticed the Appellant wearing a heavy down coat and a toboggan in the heated room of the bar. Ms. Tharp and a girlfriend were joined at their table by the victim. Later, the Appellant walked over, and the victim invited him to sit down. Ms. Tharp estimated that the Appellant was present at the table for five to seven minutes. During this time, she witnessed no angry words, fights, arguments, or any indications of a disagreement. The friends, who arrived with Ms. Tharp, left the lounge, but she remained at the table with the victim and the Appellant. The Appellant said something that Ms. Tharp could not hear. The Appellant then moved up to the edge of his chair, with his hands under the table, and moved his chair closer to the victim. Ms. Tharp said the Appellant then pulled the gun, held it close to the victim's face, and shot the victim in the area near the victim's right eye. She stated that the Appellant then calmly rose and walked out of the lounge without looking back. She also testified that neither the Appellant nor the victim appeared to be intoxicated.

On the night of the shooting, Jean Long was working as the bartender of the Star Inn Motor Lounge. She testified that she had known the victim for several years. The victim had arrived at the lounge about 8:00 p.m., and the Appellant came in about 10:00 p.m. Ms. Long said the Appellant was wearing a down-filled coat and a stocking cap. At one point, the Appellant brought in some flannel shirts and attempted to sell them. The Appellant offered to sell the shirts to the victim, but the victim declined and referred the Appellant to another person. Ms. Long did not witness any arguments, "not even a raised voice." She said the Appellant was in and out of the lounge area. While in the lounge, he sat at the corner of the bar. She served the Appellant "a few beers" and a shot of whiskey. He did not appear intoxicated to Ms. Long. Likewise, she said the victim did not seem intoxicated. She did not recall how much alcohol the victim had consumed.

Ms. Long testified that, approximately thirty minutes before closing time, she locked the outside doors so that the patrons had to exit through the motel lobby. While doing this, she observed the Appellant in the lobby talking with the owner of the Inn, Mr. Parmalee. Ms. Long went back to the lounge and gave a "last call" announcement to the customers. The Appellant came back in and ordered a beer. At this time, the victim was sitting at a table with Lori Tharp. The Appellant went to the victim's table and sat down. Ms. Long was washing dishes when she heard the gunshot. She looked up and saw the Appellant staring at the victim and a "big cloud of smoke" hovered above them. The victim had fallen over in his seat. She did not remember seeing a gun. She did not observe or hear any argument preceding the shooting and stated that "it was a real quiet night." Ms. Long ran out of the lounge and "yelled for someone to call the police." She then returned to the lounge and waited for the ambulance to arrive.

Officer Brad Sperry, a patrolman with the Cookeville Police Department, received a report

at 12:10 p.m. regarding a disturbance at the Star Motor Inn Lounge. Upon Sperry's arrival, he saw Officer Shannon Smith pointing to the white pickup truck, which the Appellant was driving. Both officers chased the truck on foot and yelled for the driver to stop. The driver of the truck proceeded onto I-40 East, and the officers then gave pursuit in their respective patrol cars. The Appellant pulled over after a mile or less of travel. The officers conducted a felony stop, and the Appellant was arrested. The Appellant complied with the officers' commands. During his search, Officer Smith recovered a weapon from the Appellant. After placing the Appellant in custody with Smith, Sperry returned to the Star Motor Inn Lounge. Officer Sperry's police car was equipped with a video camera, but he had not activated the audio as Officer Smith also had a camera and Sperry did not want to cause interference on Smith's audio reception. Officer Sperry said the Appellant offered no resistance during arrest. The officer did not detect an odor of alcohol on the Appellant at that time.

Shannon Smith, a patrolman with the Cookeville Police Department, was the first officer to arrive at the Star Motor Inn Lounge. He testified that he went into the lounge and unsuccessfully attempted to find a pulse on the victim. After issuing a radio call for EMS, he went back to the lobby. People in the lobby pointed to a departing white truck as the vehicle of the shooter. Smith encountered Officer Sperry outside, and they gave chase by foot and yelled at the Appellant to stop. Both officers then pursued the Appellant in their patrol cars. Smith said the Appellant passed one or two cars on the interstate entrance ramp and drove in an eastbound direction on I-40. After a short pursuit, the Appellant signaled and pulled over. The officers conducted a felony stop with their weapons drawn. The Appellant eventually complied with the officers' commands and was handcuffed. Officer Smith found a loaded Lorcin .25 automatic pistol in the Appellant's right front pocket. Smith read the Appellant the <u>Miranda</u> warnings before placing him in the patrol car. Smith also informed the Appellant that the camera was running and that there was a microphone in the back seat. Smith described the Appellant as complacent and calm.

Smith noticed the odor of alcohol on the Appellant while at the police station. He stated that the Appellant walked on his own and made conversation. At some point, the Appellant stated that he had consumed "about twelve beers." However, the officer said that was not consistent with his observation of the Appellant. Smith did note on his report that the Appellant was intoxicated.

On the morning of January 6th, in preparing a written report, Officer Smith reviewed the video tape. The picture and audio were functioning normally. At a later date, it was discovered that the tape was blank both as to video and audio.

Tim Terry, a criminal investigator with the Cookeville Police, stated that he first stopped at the arrest scene and made photographs before proceeding to the crime scene. There he found an empty shell casing from a .25 caliber weapon. Terry stated his contact with the Appellant at the police station was limited to casual conversation. In Terry's opinion, the Appellant seemed calm and was not drunk. The officer explained that the videos from Officers Sperry and Smith's units were blank when a review was attempted at a later date. With assistance from a television station, one tape, Sperry's, was able to be restored.

James Lane, a detective with the Cookeville Police, testified that he talked to the Appellant at the police station on the night of the Appellant's arrest. He said the Appellant had been drinking, but was neither intoxicated or under the influence. He stated that the Appellant was calm and comprehending.

Dr. Charles Harlan, a forensic pathologist, performed the autopsy on the victim and testified as to his findings. He stated that the victim died from a gunshot wound where the bullet entered the corner of the right eye and then lodged in the brain. The bullet was recovered. Dr. Harlan stated that the victim's blood alcohol level was .24 and that his blood cocaine level was .66 micrograms per milliliter. With this combination, he said "an individual might be somewhat lethargic, might appear to be slow, might have slurred speech, etc." He said such a person would be impaired.

Terry Arney, a forensic scientist with the Tennessee Bureau of Investigation, testified in her capacity as an expert firearms examiner. She had previously examined the Lorcin handgun and determined that it worked properly and that the safety was functional. The bullet that killed the victim had been recovered, and Ms. Arney did test comparisons to determine if the fatal bullet was fired from the weapon taken from the Appellant. She could not conclusively identify the fatal bullet as being fired from the Appellant's weapon but could not eliminate that possibility either. She attributed this to either poor quality, oversized rifling in the weapon, or possibly a slightly undersized bullet.

Bill Parmalee, owner of the Star Motor Inn Lounge, had known the victim approximately fifteen years and the Appellant about two years. The Appellant had been a resident at the inn in the past and was a guest in one of the rooms at the time of the shooting. At the conclusion of his shift, about 10:45 p.m., Parmalee walked into the lounge. He observed the victim sitting at a table and the Appellant sitting at the end of the bar. Later, Parmalee was sitting in the lobby watching television when a commotion erupted in the lounge. Parmalee was told the victim had been shot. The Appellant walked past Parmalee, and Parmalee said, "John, did you do anything?" The Appellant said "no" and steadily walked on. Parmalee said the Appellant appeared neither agitated or intoxicated. The next day the Appellant called Parmalee and inquired about his possessions at the motel. Parmalee asked the Appellant, "why did you do it." The Appellant answered, "we had an argument."

On cross-examination, Parmalee said that he had never had any problem with the Appellant over the two years he had known him. He described the Appellant as jovial and agreed that he was pleasant and courteous. Parmalee denied that, during their phone conversation, the Appellant made any reference to the victim having threatened him.

The Appellant testified in his own behalf. He stated that he was fifty years old and had driven tractor trailers for twelve or thirteen years. During that time, he had worked for trucking companies in Cookeville, as well as others. On January 5, 2002, the Appellant was off work. He was scheduled to move furniture and other items out of the Macon County Courthouse on the next Monday. On the night of the shooting, the Appellant had drank beer in the lounge of the motel. The Appellant said the victim accosted him while he was in the men's room. The Appellant said the

victim "grabbed hold of me and threw me up against the wall and he says I'll kill you." The Appellant said he freed himself and went outside before reentering the lounge. In the lounge, he took a seat alone at a table. The Appellant stated that the victim came to his table and sat down. Then the victim leaned toward him and said, "I'm thinking about following through on my threat to actually harm you." The Appellant said that the victim's hands were beneath the table and that the victim frightened him "very badly." The Appellant pulled his pistol and told the victim "to back off." The victim grabbed the Appellant, and the gun fired. The gun fell to the table and then to the floor. The Appellant said he was frightened, and he left in his pickup truck. He stated that he did not see the police or know they were trying to stop him until he saw the blue lights.

During cross-examination, the Appellant admitted that he lied to Bill Parmalee when he was leaving the lounge after the shooting. He admitted leaving the scene but said he was scared and nervous. He said he was going to Pilot fuel stop for a cup of coffee. He stated that he had forgotten to remove his gun and did not realize he had it until he left the restroom. The Appellant estimated that twenty to twenty-five minutes elapsed from the confrontation in the men's room until the shooting. He denied that Ms. Tharp was sitting at his table at the time of the shooting. The Appellant admitted that during his phone conversation with Bill Parmalee on the day after the shooting, he made no mention about the victim's threats to him.

Freddie Duncan, owner of Duncan Transport and Storage, testified as a character witness for the Appellant. Duncan said he had known the Appellant for about ten years and knew him to be truthful, honest, and peaceful.

Michael Lyttle, a forensic toxicologist with the Tennessee Bureau of Investigation, performed the drug toxicology on the blood and urine samples submitted from the victim. He stated that he found positive indications of cocaine, Diazepam, and Valium, with respective metabolites in the blood samples and cocaine with its metabolites in the victim's urine. He stated that alcohol and Diazepam are both depressants but have synergistic effect when combined. Cocaine is a nerve system stimulant, and Lyttle said it was difficult to opine the effects when it is mixed with the other two elements.

Dr. Glenn Farr, a professor of Pharmacy associated with the University of Tennessee College of Pharmacy and qualified as an expert in pharmacology, reviewed the toxicology report which revealed a blood alcohol level of .24 grams percent, cocaine blood level of .66 micrograms per milliliter, and the diazepenes (Diazepam and Valium) less than .25 micrograms per milliliter. He opined that when these ingredients were combined, the cocaine would tend to overcome the sedative effects of the alcohol and the diazepenes. He further stated that the combination "would lead to someone who has impaired judgment and would have some degree of invincibility and aggressiveness." Dr. Farr estimated that the victim would have had to drink approximately ten beers to reach the stated blood alcohol level. The blood level of cocaine indicated the victim "had used cocaine in very close time proximity [to his death] and perhaps a fairly strong or fairly potent amount of cocaine would have been used." On cross-examination, Dr. Farr stated that cocaine could cause a feeling of relaxation, euphoria, and gregariousness or could lead to misjudgment and aggressive

behavior. He agreed that personal observation was the best indicator of how a person acted under the influence of these ingredients. On redirect, the witness agreed that observations in a bar at midnight by drinking observers was not the optimum setting for a clinical study.

The jury was instructed regarding the elements of the following offenses: first degree murder, second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. The jury returned a verdict of second degree murder.

The Appellant presents four primary issues for review of appeal:
1.     Whether the evidence was insufficient to support his conviction for second degree murder;
2.     Whether the trial court erred in its failure to dismiss due to the State's destruction of evidence;
3.     Whether the trial court erred in its jury instructions by:
       a. not instructing the jury on aggravated assault and assault as lesser included offenses; and,
       b. improperly instructing the jury; and
4.     Whether the trial court erred in sentencing the Appellant to the maximum sentence of twenty-five years.

## I. Sufficiency of the Evidence

On appeal, the Appellant contends that the proof adduced at trial would only justify a finding of voluntary manslaughter. He bases this assertion on his allegation that the victim both threatened and assaulted him. The State argues the evidence was sufficient based on the eyewitnesses' testimony of events surrounding the shooting. We agree with the State.

When a defendant questions the sufficiency of the evidence on appeal, our standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning witness credibility are resolved by the jury. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

In this case, a conviction for second degree murder required proof that the Appellant knowingly killed another. Tenn. Code. Ann. § 39-13-210 (2003). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code. Ann. § 39-11-302(b) (2003).

The only evidence presented at trial regarding provocation of the Appellant by the victim was through the Appellant's own testimony. The Appellant claimed to have been assaulted and

threatened by the victim in the men's room of the lounge. He stated that the victim renewed his threat while the two men were seated in the lounge. Lori Tharp testified she was sitting at the same table with the Appellant and the victim and did not witness any angry words, arguments, or provocations. Ms. Tharp also testified to the Appellant's acts of pointing his weapon at the victim, shooting the victim at close range, and then calmly walking out of the lounge. Jean Long, the bartender on the night of the shooting, also testified that she had heard no arguments or raised voices, and only the gunshot broke the quiet of the evening.

The Appellant called the owner of the inn, Mr. Parmalee, on the day after the shooting. When Parmalee asked the Appellant why he shot the victim, the Appellant said only that "we had an argument." No mention was made of the alleged assault or threats by the victim.

The Appellant points to Dr. Farr's report saying that the cocaine's effects on the victim would cause a feeling of invincibility and lead to diminished judgment and aggressive behavior. However, Dr. Farr also testified that the best method of observing actual behavior of an individual's response to the ingestion of cocaine and alcohol was by clinical observation or watching them. Though by medical standards the victim was impaired, according to the witnesses present, he did not act aggressively or threaten the Appellant.

The jury's verdict makes clear that they rejected the Appellant's testimony concerning any provocations or threats toward the Appellant by the victim. We will not disturb the jury's rational verdict. There is abundant evidence to support the conviction. This issue is without merit.

## II. Destruction of Evidence

Next, the Appellant contends that the destruction of video and audio tapes of his pursuit and arrest, while in the custody of the Cookeville Police Department, deprived him of a fair trial. The Appellant argues that if the evidence had been available, it would have aided the jury in determining the Appellant's mental state immediately after the shooting and resulted in a conviction for a lesser degree of homicide. The State responds that one video was restored and shown in evidence. The officers present also testified and were cross-examined. The State further contends that the missing video/audio was irrelevant to the self-defense and provocation theories advanced by the Appellant and was insignificant in light of the overwhelming evidence of the Appellant's guilt. We concur with the State.

The standards that guide the determination of the consequences that result from the loss or destruction of evidence, which the accused contends is exculpatory, are set forth in State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999). The first step in the analysis is to determine whether the State had a duty to preserve the evidence. If it is shown that a duty existed and the State failed to preserve the evidence, then the analysis turns to several factors including:

1. The degree of negligence involved;
2. Significance of the destroyed evidence considered in light of the probative value and reliability of secondary evidence that remains available; and

3.      Sufficiency of the other evidence used at trial to support the conviction.
The overriding objective is to protect the accused's right to a fundamentally fair trial.  If, after considering all factors, the trial judge determines that a defendant cannot receive a fundamentally fair trial absent the evidence, then dismissal may be appropriate.  Other remedies may involve crafting appropriate orders to protect fair trial rights or protecting a defendant's rights by a jury instruction.  Id. at 917.

Each of the two Cookeville police officers, Smith and Sperry, who pursued and arrested the Appellant after he had left the crime scene, had patrol cars equipped with video and audio equipment.  Sperry did not activate his audio component out of concern that it would interfere with Smith's reception.  That day after the Appellant's arrest, both officers reviewed their tapes in conjunction with composing their written reports.  The tapes were functional in all respects at that time.  Both officers placed their tapes in an evidence box for preservation by the evidence clerk.  At a later date, when officers attempted to review the tapes, both were blank.  The tapes were taken to a television station for attempted reconstruction.  Officer Sperry's tape, which had not recorded audio, was reconstructed, but Officer Smith's tape could not be restored.  The restored tape, with no audio, was shown to the jury.  Additionally, both officers testified as to the circumstances of the arrest and the Appellant's demeanor, and both were cross-examined.

The State concedes that it had a duty to preserve the subject evidence, thus invoking the analysis of Ferguson.  The trial court ruled that the loss of evidence was due to simple negligence on the part of the Cookeville Police.  There is no evidence to indicate bad faith or intentional destruction by the police.  In fact, every effort was made to restore the tapes, and one tape was indeed restored.  The testimony of the arresting officers was sufficient to describe the Appellant's demeanor and his statements.  It is noteworthy that the trial court specifically found the officers to be credible witnesses.  The evidence contained on the lost audio portion of the video tape is insignificant to the Appellant's defense strategy, which was based on the victim's alleged provocations and threats.

The trial court gave the following jury instructions:
The state has a duty to gather, preserve and produce at trial evidence which may possess exculpatory value. Such evidence must be of such a nature that the Appellant would be unable to obtain comparable evidence through reasonably available means.

The state has no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory value so that an as yet unknown Appellant may later examine the evidence.

If after considering all the proof, you find the state failed to gather or preserve evidence, the contents or qualities of which are at issue and the production of which would more probably than not be of benefit to the Appellant, you may infer that the evidence would be favorable to the Appellant.

When considered in light of the testimony from witnesses at the scene of the shooting, the

-8-

missing audio of the arrest pales in significance. The unexplained loss of this evidence did not violate the Appellant's right to a fundamentally fair trial.

## III. Jury Instructions

### (a) Failure to instruct on lesser included offenses

The Appellant contends that the trial court erred by not giving an appropriate instruction of the lesser included offenses of first degree murder. The trial court instructed the jury on the charged offense and the lesser included offenses of second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. The Appellant argues that the court should have also given instructions for aggravated assault and assault. The State responds that if the failure was error, it was harmless in that the jury rejected the instructed included offenses of voluntary manslaughter, reckless homicide, and criminally negligent homicide.

The standard for an appellate court's review of the trial court's charge to the jury regarding lesser included offenses is *de novo* with no presumption of correctness. State v. Moore, 77 S.W.3d 132, 134 (Tenn. 2002). An offense is a lesser included offense if:

    (a)     all of its statutory elements are included within the statutory elements of the offense charged; or

    (b)     it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
        (1) a different mental state indicating a lesser kind of culpability; and/or
        (2)     a less serious harm or risk of harm to the same person, property or public interest; or

    (c) it consists of
        (1)     facilitation of the offense charged or of an offense that otherwise meets the definition of lesser included offense in part (a) or (b); or
        (2)     an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in part (a) or (b); or
        (3)     solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in part (a) or (b).

State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999). In evaluating whether to charge the jury on a lesser included offense, the trial court must apply the above test to determine if the lesser offense is included in the greater charged offense. Id. at 467. "If a lesser offense is not included in the offense charged, then an instruction should not be given, regardless of whether the evidence supports it." Id.

We acknowledge, as argued by the Appellant, that in State v. Paul Graham Manning, 2003 Tenn. Crim. App. LEXIS 117, No. M2002-00547-CCA-R3-CD (Tenn. Crim. App. at Nashville, Feb. 14, 2003), perm. to appeal denied (Tenn. Dec. 15, 2003), a panel of this court held that aggravated assault was a lesser included offense of murder. However, several panels of this court have also

reached the opposite conclusion. State v. Mario C. Estrada, 2003 Tenn. Crim. App. LEXIS 219, No. M2002-00585-CCA-R3-CD (Tenn. Crim. App. at Nashville, Mar. 14, 2003), rev'd on other grounds, 133 S.W.3d 606, No. M2002-00585-SC-R11-CD (Tenn. Apr. 22, 2004); State v. Renne Efren Arellano, 2003 Tenn. Crim. App. LEXIS 162, No. M2002-00380-CCA-R3-CD (Tenn. Crim. App. at Nashville, Feb. 26, 2003), rev'd on other grounds, 133 S.W.3d 606, No. M2002-00380-SC-R11-CD (Tenn. Apr. 22, 2004); State v. Randall White, 2002 Tenn. Crim. App. LEXIS 281, No. M2000-01492-CCA-R3-CD (Tenn. Crim. App. at Nashville, Mar. 27, 2002), perm. to appeal dismissed (Tenn. June 10, 2002); State v. Joshua Lee Williams and Maurice Miguel Teague, 2001 Tenn. Crim. App. LEXIS 452, No. W2000-01435-CCA-R3-CD (Tenn. Crim. App. at Jackson, June 27, 2001), perm. to appeal denied (Tenn. Oct. 29, 2001); State v. Christopher Todd Brown, 2000 Tenn. Crim. App. LEXIS 214, No. M1999-00691-CCA-R3-CD (Tenn. Crim. App. at Nashville, Mar. 9, 2000), perm. to appeal denied (Tenn. Sept. 10, 2001).[1]

In order to comport with the constitutionally guaranteed notice requirement, a defendant may only be convicted of the charged offense or of an offense which is a lesser included of the greater offense charged in the indictment. Hagner v. United States, 285 U.S. 427, 430, 52 S. Ct. 417, 418-19, 76 L. Ed. 861 (1932); State v. Moore, 77 S.W.3d 132, 134 (Tenn. 2002). Thus, the beginning point for application of the lesser included Burns test is not what the proof at trial established; rather, it begins with the indictment which provides constitutionally required notice of the charged offense. Burns, 6 S.W.3d at 465.

In Burns, our supreme court rejected the lesser included test of State v. Trusty, 919 S.W.2d 305 (Tenn. 1996), finding that the "expanded definition of lessers proved unworkable." Interestingly, in Trusty, our supreme court held that aggravated assault is not a lesser offense of attempted first degree murder, the exact issue before us today. The court in Trusty concluded that an indictment for attempted first degree murder does not provide notice of the crime of aggravated assault. Trusty, 919 S.W.2d at 310. In finding no notice, Trusty concluded that "under the Howard test, aggravated assault is not a lesser included offense of first degree murder." Id. at 312. Burns likewise adopted the Howard test, explaining, "Part (a) of [the] test defines lesser-included offenses using a statutory elements approach consistent with Howard." Burns, 6 S.W.3d at 464-67 (citing Howard v. State, 578 S.W.2d 83, 85 (Tenn. 1979)).

A conclusion that aggravated assault is a lesser offense under part (a) of Burns is clearly in conflict with our supreme court's ruling under Howard, which remains as the test under part (a) of Burns. Moreover, if indeed we are concerned with limiting, as opposed to "expanding," lesser included offenses, we are clearly going in the opposite direction as even under the "expanded" test of Trusty, aggravated assault was not a lesser included offense of first degree murder. Simply because proof of serious bodily injury is established in a murder trial, that fact would not convert the

---

[1] Although the above cases involve attempts to commit murder, the lesser included analysis necessarily begins with the statutory elements of the completed crime. Burns, 6 S.W.3d at 467 (Tenn. 1999) (holding that part (c) of the Burns lesser included test applies to criminal attempts).

-10-

prosecution into an aggravated assault trial anymore than if the proof established that the homicide victim was mutilated would convert the prosecution into an abuse of a corpse trial. It is not the evidence that controls whether an instruction on a lesser offense should be given, but whether the lesser offense is first embraced within the indictment and, if so, then whether the evidence justifies a jury instruction. If this were not so, the indictment would serve no purpose and the criminal defendant would not know what crime he or she would be defending upon until the proof was completed at trial.

An accused in a criminal prosecution has the right to receive advance notice of the charges he or she must defend upon. TENN. CONST. art. 1, § 9. When a defendant is indicted for murder, the defendant is placed upon notice that he or she will be required to answer to the charge or some lesser degree of homicide as raised by the proof at trial. Criminal homicide is defined as the unlawful killing of another person, which may be first degree murder, second degree murder, voluntary manslaughter, criminally negligent homicide, or vehicular homicide. Tenn. Code Ann. § 39-13-201. Aggravated assault is an assault accompanied by serious bodily injury or use of a deadly weapon. Tenn. Code Ann. § 39-13-102(a). Burns part (a) provides that aggravated assault is a lesser if all the "statutory elements are included within the statutory elements" of first degree murder. Burns, 6 S.W.3d at 466. The indictment in this case alleges an intentional and premeditated killing of the victim. It contains no reference to serious bodily injury or use of a deadly weapon. Clearly, none of the elements of aggravated assault are alleged in the indictment nor are these elements included within the statutory elements of first degree murder. Likewise, the elements of the various forms of assault, i.e., (1) bodily injury, (2) fear of imminent bodily injury, and (3) physical contact regarded as extremely offensive or provocative, are not alleged in the indictment and are clearly not elements of first degree murder. See Tenn. Code Ann. § 39-13-101 (a)(1)-(3). For this reason, we conclude that neither aggravated assault nor assault are lesser included offenses of first degree murder under Burns. Thus, the trial court did not err in failing to charge these crimes to the jury.

Moreover, the unlawful killing of a person is a crime distinctly different from that of an assault upon a person. Indeed, the State, through the district attorney general, has the right to elect which applicable statute shall be the basis of the indictment, subject to procedural bars and the constitutional restraints of equal protection and double jeopardy. State v. Gilliam, 901 S.W.2d 385, 389 (Tenn. Crim. App. 1995) (citing United States v. Batchelder, 442 U.S. 114, 123-25, 99 S. Ct. 2198, 2204-05, 60 L. Ed. 2d 755 (1979)). In this case, the State, for obvious reasons, chose not to indict upon the alternative theory of aggravated assault. As such, it is not our prerogative to interfere with the exercise of this discretionary authority. The balancing effect of the notice requirement is that the State chooses the crime to be prosecuted and the defendant cannot be convicted of an offense for which no notice was given. This issue is without merit.

### (b) Other Jury Issues

The Appellant also maintains that the trial court improperly instructed the jury in the following manner: (1) by instructing on "flight" when it was not justified; (2) by giving substantive jury instructions at the beginning of the trial; and (3) by giving the jury papers that counsel had not

seen. The State responds that all jury instructions were proper.

A defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000). In evaluating claims of error in jury instructions, courts must remember that "'jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning.'" State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998) (quoting Boyde v. California, 494 U.S. 370, 380-81, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990)). Therefore, we review each jury charge to determine if it fairly defined the legal issues involved and did not mislead the jury. State v. Hall, 958 S.W.2d 679, 696 (Tenn. 1997).

The trial court gave the following jury instructions concerning flight:
The flight of a person accused of a crime is a circumstance which, when considered with all the facts in the case, may justify an inference of guilt.
Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged.
Whether the evidence presented proof beyond a reasonable doubt that the Appellant fled is a question for your determination.
The law makes no precise distinction as to the manner or method of flight. It may be open or it may be hurried or concealed departure or it may be a concealment within the jurisdiction. However it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion or concealment in the community or a leaving of the community for parts unknown to constitute flight.
If flight is proven, the fact of flight alone does not allow you to find the Appellant guilty of the crime charged.
However, if flight by the Appellant may be caused by a consciousness of guilt, you may consider the fact of flight.
If flight is so proven, together with all the other evidence, then you decide the guilt or innocence of the Appellant.
On the other hand, an entirely innocent person may take flight and such flight may be explained by a proof offer or by the facts and circumstances of the case.
Whether there was flight by the Appellant, the reasons for it and the weight to be given to it are questions for you to determine.

The evidence revealed that the Appellant, after shooting the victim, calmly walked out of the motel and proceeded to leave. Two officers pursued him on foot, shouting orders to stop. The Appellant proceeded on, and the officers pursued in their vehicles for a mile or less before the Appellant pulled over and surrendered. A flight instruction is appropriate if the evidence establishes a leaving of the scene and a subsequent hiding out, evasion, or concealment in the community. State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998); Rogers v. State, 2 Tenn. Crim. App. 491, 455 S.W.2d 182, 187 (Tenn. Crim. App. 1970). The Appellant's actions clearly show a leaving of the scene and an evasion, which was cut short by the officers' intervention. The trial court's instruction was appropriate and fully justified by the evidence.

The Appellant next alleges the trial court erred in instructing the jury on substantive law at the beginning of the trial. We note that the Appellant has waived this issue on appeal by failing to register a contemporaneous objection. Tenn. R. App. P. 36(a); State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988).

The Appellant next alleges that the trial court erred in "giving the jury pieces of paper at beginning of the trial that lawyers did not see." Again, no contemporaneous objection was made, resulting in waiver of the issue. Tenn. R. App. P. 36(a); Killebrew, 760 S.W.2d at 235. Nevertheless, the record reveals nothing improper concerning the "pieces of paper," and the Appellant does not specify anything contained therein that was prejudicial to the defense. At the outset of the trial, the trial court gave each juror a folder which contained a legal pad for notes, if desired, as well as written jury instructions. The trial court shared copies of the instructions with the attorneys and read them to the jury. The Appellant has shown no prejudice resulting from this practice, and the issue is without merit.

## IV. Sentencing

The trial court applied two enhancing factors in determining the Appellant's sentence: (1) employment of a firearm during the offense, Tenn. Code Ann. § 40-35-114(10); and (2) potential for bodily injury to a victim was great, Tenn. Code Ann. § 40-35-114(17). No mitigating factors were applied in sentencing the Appellant to twenty-five years, the maximum sentence for second degree murder. The Appellant erroneously asserts that only one enhancement factor was found by the trial court, that being employment of a firearm, and that the court gave excessive weight to this factor. The State argues that sentencing was properly conducted, although it suggests that the enhancement factor for commission of the crime when risk of human life was high, Tenn. Code Ann. § 40-35-114(11), should have been utilized instead of enhancement factor (17).

The Appellant in a motion to rehear, pursuant to Rule 39 of the Tennessee Rules of Appellate Procedure, challenged the use of enhancement factors absent a jury finding as a Blakely violation and the rejection of three mitigating factors. The latter challenge is not cognizable in this proceeding pursuant to Tennessee Rule of Appellate Procedure 36(a), which provides, "A rehearing will not be granted to permit reargument of matters fully argued." This issue was fully litigated on direct appeal, and our review will be confined to the use of enhancement factors in light of Blakely, 542 U.S. 296, 124 S. Ct. 2531 (2004), and the appropriateness of the sentence imposed. Our supreme court has held that Tennessee's sentencing structure is not violative of the Sixth Amendment and, thus, is not impacted by the United States Supreme Court's decision in Blakely. See State v. Edwin Gomez and Jonathan S. Londono, No. M2002-01209-SC-R77-CD, ___ S.W.3d ___ (Tenn. Apr. 25, 2005). Accordingly, our remaining review will focus on the appropriateness of the sentence imposed.

Appellate review of sentencing is *de novo* on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The Sentencing Commission Comments on this section reveal that the burden is on the appealing party to show that the sentence

is improper.  If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is *de novo*.

In conducting our review, we are required, pursuant to Tennessee Code Annotated section 40-35-210, to consider the following factors in sentencing:
> (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal code involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and (6) any statement the Appellant wishes to make in the Appellant's own behalf about sentencing.

As the Appellant was convicted of a Class A felony, the presumptive sentence shall be the midpoint of the range.  Tenn. Code Ann. § 40-35-210(c); State v. Chance, 952 S.W.2d 848, 850 (Tenn. Crim. App. 1997).  However, if enhancement and mitigating factors apply, a trial court must start at the midpoint of the range, enhance the sentence as appropriate for enhancement factors, and then reduce the sentence within the range for the mitigating factors.  Tenn. Code Ann. § 40-35-210(e); State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).  No particular weight for each factor is prescribed by the statute, as the weight given to each factor is left to the discretion of the trial court as long as the trial court complies with the purposes and principles of the sentencing act and its findings are supported by the record.  State v. Madden, 99 S.W.3d 127, 138 (Tenn. Crim. App. 2002); Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments.  Should there be no mitigating factors applicable but enhancement factors are present, a trial court may set the sentence above the midpoint within the range.  Tenn. Code Ann. § 40-35-210(d); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).  If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after giving due consideration and proper weight to the factors and principles set out under sentencing law, and the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result.  State v. Hooper, 29 S.W.3d 1, 5 (Tenn. 2000).

The range of punishment for a Range I defendant convicted of a Class A felony is fifteen to twenty-five years.  Tenn. Code Ann. § 40-35-112(a)(1).  Thus, the midpoint of the range is twenty years.  In this case, the trial judge found two enhancing factors: (10) employment of a firearm during the offense; and (17) potential for bodily injury to a victim was great.  Tenn. Code Ann. § 40-35-114(10), (17).  The Appellant urged the trial court to adopt three mitigating factors:  (2) the Appellant acted under strong provocation; (3) substantial grounds exist tending to excuse or justify the Appellant's conduct, and (13) the Appellant committed the offense under such unusual circumstances as to make sustained intent to violate the law unlikely.  Tenn. Code Ann. § 40-35-113(2), (3), (13).  These mitigating factors were credible only if the testimony of the Appellant was accepted.  The jury, by its verdict, implicitly rejected the Appellant's testimony.  The trial court found that "there wasn't any provocation whatsoever."  We believe the trial court correctly rejected the proposed mitigating factors.

We agree with the State that <u>State v. Imfeld</u>, 70 S.W.3d 698, 706 (Tenn. 2002), dictates that the trial court erred in applying enhancement factor (17). However, <u>Imfeld</u> provides that the trial court could have used enhancement factor (11), the Appellant's lack of hesitation to commit a crime when risk to human life was high, under the facts in this case. We further note that the trial court gave a "great deal of weight" to enhancement factor (10), the employment of a weapon, in reaching the sentence. Having concluded that two enhancement factors were justified and no mitigating factors were present, we affirm the sentence as imposed by the trial court.

## Conclusion

After a careful review of the record in this cause, we conclude that the evidence was sufficient to support the Appellant's conviction for second degree murder beyond a reasonable doubt. The loss of the audio evidence while in the State's possession did not deprive the Appellant of a fundamentally fair trial. We further find that there was no error in not charging the jury with aggravated assault and assault, as they are not lesser included offenses of first degree murder. In all other respects, the jury instructions were appropriate and justified by the evidence. Although one enhancement factor was misapplied, another unconsidered enhancement factor was justified by the facts. Tennessee's sentencing structure is not affected by <u>Blakely</u>. Thus, the conviction and sentence are affirmed.

_____
JUDGE JOHN EVERETT WILLIAMS